**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JORDAN ROY, and
JUSTIN TRUMBULL, on behalf of themselves and others similarly situated,

Plaintiffs,

v.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

Case No.: 3:17-cv-30116-KAR

**DEFENDANT FEDEX GROUND'S MOTION TO DECERTIFY FLSA CONDITIONAL COLLECTIVE**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

TABLE OF APPENDICES AND EXHIBITS ..... vii

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 5

I. SERVICE PROVIDERS EMPLOY PLAINTIFFS AND OPT-INS AND MAKE ALL EMPLOYMENT DECISIONS ..... 5

A. FedEx Ground Contracts with Independent Businesses in Massachusetts to Provide Package Pickup and Delivery Services ..... 5

B. Service Provider Owners Decide How to Operate Their Businesses ..... 5

II. THE EMPLOYMENT SETTINGS AMONG PLAINTIFFS AND OPT-INS DIFFER IN MATERIAL RESPECTS ..... 7

A. Service Providers Pay Plaintiffs and Opt-Ins Different Ways and Amounts ..... 8

B. Plaintiffs and Opt-Ins Worked Different Schedules and Varying Hours Set by Their Different Service Providers ..... 9

C. Opt-Ins Drove Light Vehicles (If at All) for Different Amounts of Time During Their Employment with Service Providers ..... 10

D. Opt-ins Report Different Work Conditions and Experiences from Service Provider to Service Provider ..... 11

E. Opt-ins' Experiences and Interactions with FedEx Ground Personnel Differ ..... 12

III. SERVICE PROVIDERS MAINTAIN ALL EMPLOYMENT RECORDS ..... 14

A. FedEx Ground Does Not Maintain a Record of Drivers' Compensable Time ..... 14

B. FedEx Ground Has Limited Access to Drivers' Wage and Hour Records ..... 16

C. FedEx Ground Has Incomplete Information Concerning Vehicle Weight ..... 17

LEGAL STANDARD ..... 18

ARGUMENT ..... 20

I. THE OPT-INS' DISPARATE FACTUAL AND EMPLOYMENT SETTINGS SHOW THEY ARE NOT SIMILARLY SITUATED .................... 20

A. Plaintiffs' and Opt-Ins' Overtime Claims Are Not Unified by a Common Policy or Practice that Violates the FLSA .................... 20

1. FedEx Ground's alleged status as a joint employer does not provide a basis for maintaining a collective action. .................... 21

2. FedEx Ground's decision to contract with Service Providers had no common impact on Plaintiffs' or opt-ins' pay or the occurrence of any alleged overtime violations. .................... 25

B. Material Differences in Opt-ins' Factual and Employment Settings Preclude Collective Resolution of Their Overtime Claims and Require Decertification .................... 27

II. FEDEX GROUND'S INDIVIDUALIZED DEFENSES AGAINST DRIVERS' CLAIMS REQUIRE DECERTIFICATION .................... 27

A. Plaintiffs Cannot Prove Joint Employment with Common Evidence, thus Raising Individualized Claims and Defenses .................... 28

B. Eligibility for Overtime under the Small Vehicle Exception to the MCA Exemption Is an Individualized, Driver-by-Driver Determination .................... 30

C. FedEx Ground Is Permitted to Challenge Plaintiffs' Ability to Prove that Opt-Ins Were Entitled to, But Not Paid, Overtime .................... 32

1. Plaintiffs and opt-ins were paid under pay methods set by 162 different Service Providers, precluding representative proof of overtime violations .................... 33

2. Opt-ins worked varying hours that were recorded, if at all, pursuant to Service Providers' different policies .................... 34

D. FedEx Ground Is Entitled to Challenge Individual Damages Claims .................... 36

E. Inconsistent Testimony and Questions about Plaintiffs' and Opt-Ins' Credibility Underscore the Individuality of FedEx Ground's Defenses .................... 37

III. FAIRNESS AND MANAGEABILITY CONSIDERATIONS WARRANT DECERTIFICATION OF THE CONDITIONALLY-CERTIFIED COLLECTIVE .................... 39

CONCLUSION .................... 40

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946) .......... 32, 36

*Aquilino v. Home Depot, U.S.A., Inc.*,
No. CIVA. 04-04100 PGS, 2011 WL 564039
(D.N.J. Feb. 15, 2011) .......... 38

*Arnold v. Directv, LLC*,
No. 4:10-cv-352, 2017 WL 1251033
(E.D. Mo. Mar. 31, 2017) .......... 29, 40

*Avila v. SLSCO, Ltd.*,
No. 3:18-cv-00426, 2022 WL 784062
(S.D. Tex. Mar. 15, 2022) .......... passim

*Bayles v. Am. Med. Resp. of Colo., Inc.*,
950 F. Supp. 1053 (D. Colo. 1996) .......... 34

*Baystate Alternative Staffing, Inc. v. Herman*,
163 F.3d 668 (1st Cir. 1998) .......... 28

*Brinker Rest. Corp. v. Sup. Ct.*,
53 Cal. 4th 1004 (2012) .......... 30

*Campbell v. City of L.A.*,
903 F.3d 1090 (9th Cir. 2018) .......... 21

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) .......... 19

*Carley v. Crest Pumping Techs., L.L.C.*,
890 F.3d 575 (5th Cir. 2018) .......... 31

*Carrier Corp. v. N.L.R.B.*,
768 F.2d 778 (6th Cir. 1985) .......... 28

*Carruthers v. Keiser Sch., Inc.*,
No. 8:09-cv-02641, 2010 WL 5055876
(M.D. Fla. Dec. 3, 2010) .......... 19

*Compare Henderson v. Equilon Enters., LLC*,
40 Cal. App. 5th 1111 (2019) .......... 28

*Cooper v. Noble Casing, Inc.*,
No. 15-cv-1907, 2016 WL 6525740
(D. Colo. Nov. 3, 2016) ..... 32

*Corley v. FedEx Ground Package Sys., Inc.*,
No. 5:19-cv-00429, 2022 WL 1805435
(C.D. Cal. June 2, 2022) ..... 1, 24

*Creal v. Grp. O, Inc.*,
155 F. Supp. 3d 831 (N.D. Ill. 2016) ..... 30

*Creely v. HCR ManorCare, Inc.*,
920 F. Supp. 2d 846 (N.D. Ohio 2013) ..... 22

*DaRosa v. Speedway LLC*,
557 F. Supp. 3d 315 (D. Mass. 2021) ..... 18, 20

*Emonds v. Amazon.com, Inc.*,
No. 2:19-cv-01613, 2020 WL 5993908
(W.D. Wash. Oct. 9, 2020) ..... 23

*Espenscheid v. DirectSat USA, LLC*,
No. 09-cv-625, 2011 WL 2009967
(W.D. Wis. May 23, 2011)
*aff'd*, 705 F.3d 770 (7th Cir. 2013) ..... passim

*Frye v. Baptist Mem'l Hosp., Inc.*,
495 F. App'x 669 (6th Cir. 2012) ..... 19

*Gibbs v. MLK Express Servs., LLC*,
No. 2:18-cv-434, 2019 WL 2635746
(M.D. Fla. June 27, 2019) ..... 23, 24, 29

*Gomez v. Loomis Armored US, LLC*,
No. 5:16-CV-931, 2017 WL 7052254
(W.D. Tex. Oct. 26, 2017) ..... 31

*Hinds v. FedEx Ground Package Sys., Inc.*,
No. 18-cv-01431, 2021 WL 4926980
(N.D. Cal. Aug. 18, 2021) ..... passim

*Hunter v. Sprint Corp.*,
346 F. Supp. 2d 113 (D.D.C. 2004) ..... 19

*Johnson v. Big Lots Stores, Inc.*,
561 F. Supp. 2d 567 (E.D. La. 2008) ..... 38, 39

*Johnson v. VCG Holding Corp.*,
802 F. Supp. 2d 227 (D. Me. 2011) ........................................ 18

*Levine v. Vitamin Cottage Nat. Food Mkts., Inc.*,
No. 20-cv-00261, 2023 WL 3648684
(D. Colo. May 25, 2023) ........................................ 37, 38, 40

*Lockhart v. D&S Residential Servs., LP*,
No. 2:18-cv-02586, 2020 WL 4717910
(W.D. Tenn. Aug. 13, 2020) ........................................ 19

*Martin v. Sprint/united Mgmt. Co.*,
No. 15 Civ. 5237 (PAE), 2016 WL 30334
(S.D.N.Y. Jan. 4, 2016) ........................................ 19, 23

*Mathis v. Darden Rests.*,
No. 12-cv-61742, 2014 WL 4428171
(S.D. Fla. Sept. 1, 2014) ........................................ 20, 27, 40

*McElwee v. Bryan Cowdery, Inc.*,
No. 2:21-cv-1265, 2021 WL 5027410
(S.D. Ohio Oct. 29, 2021) ........................................ 40

*McKnight v. Honeywell Safety Prod. USA, Inc.*,
No. CV 16-132 S, 2017 WL 3447894
(D.R.I. Aug. 11, 2017) ........................................ 18

*Medina v. Equilon Enters., LLC*,
68 Cal. App. 5th 868 (2021) ........................................ 28

*Merrill v. Pathway Leasing LLC*,
No. 16-CV-02242, 2019 WL 5078655
(D. Colo. Oct. 9, 2019) ........................................ 36, 37

*Nelson v. FedEx Ground Package Sys., Inc.*,
No. 18-cv-01378, 2018 WL 6715897
(D. Colo. Dec. 21, 2018) ........................................ 1, 23

*Noll v. Flowers Foods Inc.*,
478 F. Supp. 3d 59 (D. Me. 2020) ........................................ 19, 20, 31

*Norceide v. Cambridge Health All.*,
No. CIVA 10-11729-NMG, 2014 WL 775453
(D. Mass. Feb. 24, 2014) ........................................ passim

*O'Brien v. Ed Donnelly Enters., Inc.*,
575 F.3d 567 (6th Cir. 2009) ........................................ 19

*Oglesby v. FedEx Ground Package Sys., Inc.*,
No. 3:20-cv-346, 2023 WL 4740160
(S.D. Ohio July 25, 2023) .......... 1, 4, 23, 26

*Overpeck v. FedEx Corp.*,
No. 18-cv-07553, 2022 WL 888441
(N.D. Cal. Mar. 25, 2022) .......... 1, 24, 40

*Proctor v. Allsups Convenience Stores, Inc.*,
250 F.R.D. 278 (N.D. Tex. 2008) .......... 39

*Purdham v. Fairfax Cnty. Pub. Sch.*,
629 F. Supp. 2d 544 (E.D. Va. 2009) .......... 22

*R&R*,
2019 WL 1437765
(D. Colo. Feb. 8, 2019) .......... 1

*Reed v. Cnty of Orange*,
266 F.R.D. 446 (C.D. Cal. 2010) .......... 40

*Rindfleish v. Gentiva Health Servs., Inc.*,
22 F. Supp. 3d 1295 (N.D. Ga. 2014) .......... 28

*Rojas v. Garda CL Se., Inc.*,
No. 1:13-cv-23173, 2015 WL 5084135
(S.D. Fla. Aug. 28, 2015) .......... 31

*Rosales v. Indus. Sales & Servs. LLC*,
No. 6:20-CV-00030, 2021 WL 4480747
(S.D. Tex. Sept. 30, 2021) .......... 31

*Roy v. FedEx Ground Package Sys., Inc.*,
353 F. Supp. 2d 43 (D. Mass. 2018) .......... 21

*Sanchez v. Simply Right, Inc.*,
No. 15-cv-00974, 2017 WL 2222601
(D. Colo. May 22, 2017) .......... 28

*Scott v. Raudin McCormick, Inc.*,
No. 08-4045-EFM, 2010 WL 5093650
(D. Kan. Dec. 8, 2010) .......... 22, 26

*Sec'y of Lab. v. DeSisto*,
929 F.2d 789 (1st Cir. 1991) .......... 39

*Smith v. Smithfield Foods, Inc.*,
No. 2:21-cv-194, 2021 WL 6881062
(E.D. Va. Dec. 21, 2021) ........................................ 26

*Trevino v RDL Energy Servs., L.P.*,
No. CV H-14-1936, 2016 WL 11477431
(S.D. Tex. July 21, 2016)........................................ 31

*Venegas v. Glob. Aircraft Serv., Inc.*,
159 F. Supp. 3d 93 (D. Me. 2016) ........................................ 19

*White v. 14051 Manchester Inc.*,
301 F.R.D. 368 (E.D. Mo. 2014) ........................................ 26

*Zavala v. Wal Mart Stores Inc.*,
691 F.3d 527 (3d Cir. 2012)........................................ passim

*Zavala v. Wal-Mart Stores, Inc.*,
No. 2:03-cv-05309, 2010 WL 2652510
(D.N.J. June 25, 2010) ........................................ 25, 26, 29

**STATUTES**

29 U.S.C. § 207........................................ 37

29 U.S.C. § 216........................................ 18

**REGULATIONS**

29 C.F.R. § 778.103 ........................................ 35

29 C.F.R. § 778.105 ........................................ 35

29 C.F.R. § 778.109 ........................................ 37

29 C.F.R. §§ 110-113........................................ 37

49 C.F.R. § 395.2 ........................................ 14

49 C.F.R. § 395.3 ........................................ 10

# TABLE OF APPENDICES AND EXHIBITS

| | |
|---|---|
| **APPENDICES** | |
| Appendix A | Table Summarizing Factual Differences Among Plaintiffs |
| Appendix B | Table Summarizing Examples of Differences Among Service Providers and the Lack of Evidence Related to Many |
| Appendix C (filed under seal) | Table Identifying Differences in Pay Method and Amount |
| Appendix D | Table Summarizing Range of Hours Worked as Reported in Various Sources |
| Appendix E | Table of Admissions Concerning Role of Service Providers |
| Appendix F | Table Identifying Written Statements Recanted or Contradicted by Deposition Testimony |
| **DECLARATIONS** | |
| Exhibit 1 | Declaration of Brian Berger ("Berger Decl.") |
| Exhibit 2 | Declaration of Joseph Oliver Bracken ("Bracken Decl.") |
| Exhibit 3 | Declaration of Neil Brahmbhatt ("Brahmbhatt Decl.") |
| Exhibit 4 | Declaration of Sergion Esteireiro ("Esteireiro Decl.")<br>A – Mr. Lassiter's Text Messages |
| Exhibit 5 | Declaration of Robert Fonseca ("Fonseca Decl.") |
| Exhibit 6 | Declaration of Mark Haley ("Haley Decl.") |
| Exhibit 7 | Declaration of Jeffrey Hemingway ("Hemingway Decl.") |
| Exhibit 8 | Declaration of Dennis Leandres ("Leandres Decl.") |
| Exhibit 9 | Declaration of Henrry A. Mendranoespinoza ("Mendranoespinoza Decl.") |
| Exhibit 10 | Declaration of Stephanie Newmont ("Newmont Decl.") |
| Exhibit 11 | Declaration of Flaviano Oliveira ("Oliveira Decl.") |
| Exhibit 12 | Declaration of Michael Ripley ("Ripley Decl.") |
| Exhibit 13 | Declaration of Allison Rosales ("Rosales Decl.")<br>A – Independent Service Provider Agreement<br>B – Contractor Relations, Policy 007 |

| | |
|---|---|
| Exhibit 14 | Declaration of Jessica G. Scott ("Scott Decl.")<br>A – *Claiborne* – Memorandum Opinion<br>B – *Aristizabal* – Order and Hearing Transcript<br>C – *Lightfoot* – Order Denying Motion for Class Certification<br>D – Email from Mr. Zach Rubin |
| **DEPOSITIONS** | |
| Exhibit 15 | Deposition of Denise Blais ("Blais Dep.") |
| Exhibit 16 | Deposition of Thomas Davis ("Davis Dep.") |
| Exhibit 17 | Deposition of Samantha Dean ("Dean Dep.") |
| Exhibit 18 | Deposition of Amber Anise Dillion ("Dillion Dep.") |
| Exhibit 19 | Deposition of Eric William Flowers, Sept. 29, 2021 ("Flowers Dep. I") |
| Exhibit 20 | Deposition of Eric William Flowers, Nov. 19, 2021 ("Flowers Dep. II") |
| Exhibit 21 | Deposition of Cristiano L. Julio ("Julio Dep.") |
| Exhibit 22 | Deposition of Scott J. Lessard ("Lessard Dep.") |
| Exhibit 23 | Deposition of Donald Linder ("Linder Dep.") |
| Exhibit 24 | Deposition of Paul Marzilli ("Marzilli Dep.") |
| Exhibit 25 | Deposition of Dana McDonald ("McDonald Dep.") |
| Exhibit 26 | Deposition of Ricardo F. Mendonca ("Mendonca Dep.") |
| Exhibit 27 | Deposition of Thomas Robert Monahan ("Monahan Dep.") |
| Exhibit 28 | Deposition of Donald Moore, Jr. ("Moore Dep.") |
| Exhibit 29 | Deposition Tristao D. Neto ("Neto Dep.") |
| Exhibit 30 | Deposition of Stephanie Newmont ("Newmont Dep.") |
| Exhibit 31 | Deposition of Paul A. Odierno ("Odierno Dep.") |
| Exhibit 32 | Deposition of Thomas Pierce ("Pierce Dep.") |
| Exhibit 33 | Deposition of Christopher A. Pilotte ("Pilotte Dep.") |
| Exhibit 34 | Deposition of Jesse M. Reid ("Reid Dep.") |
| Exhibit 35 | Deposition of Erick J. Robertson ("Robertson Dep.") |
| Exhibit 36 | Deposition of Allison Rosales ("Rosales Dep.") |
| Exhibit 37 | Deposition of Jordan Roy ("Roy Dep.") |
| Exhibit 38 | Deposition of Scott Sattler ("Sattler Dep.") |
| Exhibit 39 | Deposition of Teixeira Barros, Antonio Jorge ("Teixeira Barros Dep.") |

| | |
|---|---|
| Exhibit 40 | Deposition of George Therrien ("Therrien Dep.") |
| Exhibit 41 | Deposition of Trumbull, Justin ("Trumbull Dep.") |
| Exhibit 42 | Deposition of Richard Vander Brug ("Vander Brug Dep.") |
| Exhibit 43 | Deposition of Amanda Rose Wheelock-Graves ("Wheelock-Graves Dep.") |
| **PLAINTIFF AND OPT-IN DOCUMENTS: QUESTIONNAIRE RESPONSES, INTERROGATORY RESPONSES, AFFIDAVITS, AND SUMMARY DATA** | |
| Exhibit 44 | Allen, Kenneth<br>A – Ques.<br>B – Summary Data |
| Exhibit 45 | Amaral, Jeremy Michael Anthony<br>A – Ques.<br>B – Summary Data |
| Exhibit 46 | Ayala-Robles, Roberto Carlos<br>A – Ques.<br>B – Summary Data |
| Exhibit 47 | Baez, Jose A.<br>Summary Data |
| Exhibit 48 | Barros, Antonio<br>A – Ques.<br>B – Summary Data |
| Exhibit 49 | Barry, Darryl<br>A – Ques.<br>B – Summary Data |
| Exhibit 50 | Bernadeau, William<br>Summary Data |
| Exhibit 51 | Bernasconi, Jorge U<br>Summary Data |
| Exhibit 52 | Bjorlie, Matthew<br>A – Ques.<br>B – Summary Data |

| | |
|---|---|
| Exhibit 53 | Bonilla, Tommy<br>A – Ques.<br>B – Summary Data |
| Exhibit 54 | Brito, Fernando<br>A – Ques.<br>B – Summary Data |
| Exhibit 55 | Cantin, Christopher Michael<br>Summary Data |
| Exhibit 56 | Chambers, Zina<br>A – Ques.<br>B – Summary Data |
| Exhibit 57 | Charpentier, Tabitha<br>A – Ques.<br>B – Summary Data |
| Exhibit 58 | Collazo, Pedro<br>A – Ques.<br>B – Summary Data |
| Exhibit 59 | Cosme, Carlos<br>A – Ques.<br>B – Summary Data |
| Exhibit 60 | Costello, John<br>A – Ques.<br>B – Summary Data |
| Exhibit 61 | Davis, Thomas<br>A – Ques.<br>B – Summary Data |
| Exhibit 62 | Dean, Samantha<br>A – Ques.<br>B – Summary Data |
| Exhibit 63 | Diep, Pablo Yasset<br>Summary Data |

| | |
|---|---|
| Exhibit 64 | Dillon, Amber<br>A – Ques.<br>B – Summary Data |
| Exhibit 65 | Doerr, Erich<br>A – Ques.<br>B – Summary Data |
| Exhibit 66 | Doyle, Sean<br>A – Ques.<br>B – Summary Data |
| Exhibit 67 | Eddington, Keith<br>A – Ques.<br>B – Summary Data |
| Exhibit 68 | Eppinger, Robert<br>A – Ques.<br>B – Summary Data |
| Exhibit 69 | Flood, Christopher<br>Summary Data |
| Exhibit 70 | Flowers, Eric<br>A – Ques.<br>B – Summary Data |
| Exhibit 71 | Fowler, Diana<br>A – Ques.<br>B – Summary Data |
| Exhibit 72 | Germain, Enso<br>A – Ques.<br>B – Summary Data |
| Exhibit 73 | Giovinco Salvatore<br>A – Ques.<br>B – Summary Data |
| Exhibit 74 | Gonsalves, Vannesa Ann<br>A – Ques.<br>B – Summary Data |

| | |
|---|---|
| Exhibit 75 | Hamzh Sr., Wahib<br>Summary Data |
| Exhibit 76 | Harrell, Steven<br>A – Ques.<br>B – Summary Data |
| Exhibit 77 | Harvey, Sherri<br>Summary Data |
| Exhibit 78 | Hollister, Craig<br>A – Ques.<br>B – Summary Data |
| Exhibit 79 | Howland, Frank<br>A – Ques.<br>B – Summary Data |
| Exhibit 80 | Infante, George<br>A – Ques.<br>B – Summary Data |
| Exhibit 81 | Intentionally Skipped |
| Exhibit 82 | Ingram, Eric<br>A – Ques.<br>B – Summary Data |
| Exhibit 83 | Johnson, Marc<br>A – Ques.<br>B – Summary Data |
| Exhibit 84 | Jones Jr, Samuel<br>A – Ques.<br>B – Summary Data |
| Exhibit 85 | Julio, Cristiano<br>A – Ques.<br>B – Summary Data |

| | |
|---|---|
| Exhibit 86 | Keefe, Matthew<br>A – Ques.<br>B – Summary Data |
| Exhibit 87 | Krutov, Andrey<br>A – Ques.<br>B – Summary Data |
| Exhibit 88 | Lawrence, Bryan<br>A – Ques.<br>B – Summary Data |
| Exhibit 89 | Lessard, Scott<br>A – Ques.<br>B – Summary Data |
| Exhibit 90 | Lima, Mario<br>A – Ques.<br>B – Summary Data |
| Exhibit 91 | Marcheselli II, Gino<br>A – Ques.<br>B – Summary Data |
| Exhibit 92 | Martin, Kevin<br>A – Ques.<br>B – Summary Data |
| Exhibit 93 | Marzilli, Paul<br>A – Ques.<br>B – Summary Data |
| Exhibit 94 | McDonald, Dana<br>A – Ques.<br>B – Summary Data |
| Exhibit 95 | Mendonca, Ricardo<br>A – Ques.<br>B – Summary Data |

| | |
|---|---|
| Exhibit 96 | Michaud, Rachel<br>A – Ques. (07-10-20)<br>B – Ques. (10-22-21)<br>C – Summary Data |
| Exhibit 97 | Monahan, Thomas<br>A – Ques.<br>B – Summary Data |
| Exhibit 98 | Moore, Donald<br>A – Ques.<br>B – Summary Data |
| Exhibit 99 | Intentionally Skipped |
| Exhibit 100 | Morris, Richard Barthemess<br>Summary Data |
| Exhibit 101 | Morrison, David<br>A – Ques.<br>B – Summary Data |
| Exhibit 102 | Mulvey, Keith<br>A – Ques.<br>B – Summary Data |
| Exhibit 103 | Naboh, John<br>A – Ques.<br>B – Summary Data |
| Exhibit 104 | Neimerck Jr, Michel<br>A – Ques.<br>B – Summary Data |
| Exhibit 105 | Neto, Tristao<br>A – Ques. (07-23-20)<br>B – Ques. (08-28-20)<br>C – Summary Data |

| | |
|---|---|
| Exhibit 106 | Odierno, Paul<br>A – Ques.<br>B – Summary Data |
| Exhibit 107 | Paraskivas, John<br>A – Ques.<br>B – Summary Data |
| Exhibit 108 | Pilotte, Christopher<br>A – Ques.<br>B – Summary Data |
| Exhibit 109 | Reid, Jesse<br>A – Ques.<br>B – Summary Data |
| Exhibit 110 | Reyes, Krystal<br>A – Ques.<br>B – Summary Data |
| Exhibit 111 | Rivers Jason<br>A – Ques.<br>B – Summary Data |
| Exhibit 112 | Roberson III, Frederick<br>A – Ques.<br>B – Summary Data |
| Exhibit 113 | Robertson, Erick Jay<br>A – Ques.<br>B – Summary Data |
| Exhibit 114 | Roy, Jordan<br>A – Interrogatory Responses<br>B – Affidavit of Jordan Roy (filed in support of conditional certification)<br>C – Summary Data |
| Exhibit 115 | Santos, Wallace<br>A – Ques.<br>B – Summary Data |

| | |
|---|---|
| Exhibit 116 | Sattler, Scott<br>A – Ques.<br>B – Summary Data |
| Exhibit 117 | Scarbrough, Luke<br>Summary Data |
| Exhibit 118 | Spurr, Michael<br>A – Ques.<br>B – Summary Data |
| Exhibit 119 | Sumpter Jr., Derrick<br>A – Ques.<br>B – Summary Data |
| Exhibit 120 | Tambasidis, Irenarhos<br>A – Ques.<br>B – Summary Data |
| Exhibit 121 | Taylor Jr., John<br>A – Ques.<br>B – Summary Data |
| Exhibit 122 | Therrien, George<br>A – Ques.<br>B – Summary Data |
| Exhibit 123 | Timmons, Michael<br>A – Ques.<br>B – Summary Data |
| Exhibit 124 | Torra Jr., Anthony Nicholas<br>Summary Data |
| Exhibit 125 | Traywick, Robert Leon<br>Summary Data |
| Exhibit 126 | Trumbull, Justin<br>A – Interrogatory Responses<br>B – Affidavit of Justin Trumbull (filed in support of conditional certification)<br>C – Summary Data |

| | |
|---|---|
| Exhibit 127 | Twaddle, Gary<br>A – Ques.<br>B – Summary Data |
| Exhibit 128 | Vander Brug, Richard<br>A – Ques.<br>B – Summary Data |
| Exhibit 129 | Velazquez, Oscar<br>Summary Data |
| Exhibit 130 | Wheelock-Graves, Amanda<br>A – Ques.<br>B – Summary Data |
| Exhibit 131 | Wilson Sr., John Scott<br>A – Ques.<br>B – Summary Data |
| Exhibit 132 | Witzel, Paul<br>Summary Data |
| Exhibit 133 | Wosko, Nick<br>A – Ques.<br>B – Summary Data |
| **ADDITIONAL DOCUMENTS (Grouped by Service Provider)** | |
| Exhibit 134<br>(filed under seal) | A and A Group Inc.<br>Payroll Details (excerpts) |
| Exhibit 135<br>(filed under seal) | A & S Transportation Inc.<br>A – Employee Earnings Record (excerpts)<br>B – Timecard |
| Exhibit 136<br>(filed under seal) | ABL Enterprise Corp.<br>A – Direct Deposit Vouchers<br>B – Timesheets |

| | |
|---|---|
| Exhibit 137<br>(filed under seal) | Alpha Delivery<br>A – Direct Deposit Vouchers<br>B – Payroll Report<br>C – Employee Rate & Hours Table |
| Exhibit 138<br>(filed under seal) | AMD Delivery<br>Payroll Summary (excerpts) |
| Exhibit 139<br>(filed under seal) | AMP Transport Inc.<br>A – Employee Handbook<br>B – Paystubs |
| Exhibit 140<br>(filed under seal) | Apex Delivery Logistics<br>A – Earnings Statements<br>B – Payroll Spreadsheet |
| Exhibit 141<br>(filed under seal) | Authentic Delivery Services Inc.<br>A – Employee Earning Record<br>B – Employee Pay Report<br>C – Time Records |
| Exhibit 142<br>(filed under seal) | AYS Express Delivery<br>Paystubs |
| Exhibit 143<br>(filed under seal) | B&O Delivery Services, Inc.<br>A – Payroll Summary<br>B – Paystubs<br>C – Timecards |
| Exhibit 144<br>(filed under seal) | BBJM Management, Inc.<br>Paystubs |
| Exhibit 145<br>(filed under seal) | Becks Transportation Inc.<br>A – Paystubs<br>B – Week Ending Time Sheet |
| Exhibit 146<br>(filed under seal) | Bellaire Enterprises, Inc.<br>A – Payroll Journal (excerpt)<br>B – Timesheets |

| | |
|---|---|
| Exhibit 147<br>(filed under seal) | BLF Courier, Inc.<br>A – Direct Deposit Vouchers<br>B – Federal Quarterly Filing Information<br>C – Weekly Time Card |
| Exhibit 148<br>(filed under seal) | Bynes Transportation,<br>A – Payroll Details Report (excerpt)<br>B – Payroll Summary (excerpt) |
| Exhibit 149<br>(filed under seal) | Carpenter Delivery Service<br>Payroll Register (excerpt) |
| Exhibit 150<br>(filed under seal) | CJ Delivery Service Corp.<br>A – Payroll Details (excerpts)<br>B – Paystub |
| Exhibit 151<br>(filed under seal) | Coastal Package, Inc.<br>A – Payroll Journal (excerpt)<br>B – Paystubs (excerpts)<br>C – Timecards |
| Exhibit 152<br>(filed under seal) | CRGK Trucking Inc.<br>A – Earnings Report (excerpt)<br>B – Paystubs<br>C – Payroll Registers (excerpts)<br>D – Timesheet |
| Exhibit 153<br>(filed under seal) | D&H Packaging Solutions Inc.<br>A – Payroll Journal (excerpts)<br>B – Timesheet |
| Exhibit 154<br>(filed under seal) | D&S Delivery Inc.<br>A – Employee Earnings Statements<br>B – Timesheets |
| Exhibit 155<br>(filed under seal) | DBW Delivery Inc.<br>Employee Earnings Record (excerpts) |

| | |
|---|---|
| Exhibit 156<br>(filed under seal) | Delpex, Inc.<br>A – Employee Manual<br>B – Payroll Details (excerpts) |
| Exhibit 157<br>(filed under seal) | DL Delivery<br>A – Letter from Leonard Berch<br>B – Initial Compliance Disclosure Certification<br>C – Employee Earning Record (excerpts) |
| Exhibit 158<br>(filed under seal) | Draco Transports of Boston<br>Payroll Report (excerpts) |
| Exhibit 159<br>(filed under seal) | Druze Inc.<br>A – Employee Earnings Record (excerpts)<br>B – Payroll Journal (excerpt)<br>C – Hours Report |
| Exhibit 160<br>(filed under seal) | DS Ground Service, Inc.<br>Employee Summary Earnings (excerpt) |
| Exhibit 161<br>(filed under seal) | Dunamis Delivery<br>Year to Date Report (excerpts) |
| Exhibit 162<br>(filed under seal) | Dunn Right Delivery Inc.<br>Earnings Statements |
| Exhibit 163<br>(filed under seal) | Eagle Eye, Inc.<br>A – Compliance Disclosures and Certifications<br>B – Compliance Questionnaire<br>C – Daoust Paystub<br>D – Pay Agreements<br>E – Pilotte Pay Rate Notice<br>F – Timesheet |
| Exhibit 164<br>(filed under seal) | Elite Towing and Repair, Inc.<br>A – Paystub<br>B – Payroll and Time Records |

| | |
|---|---|
| Exhibit 165<br>(filed under seal) | EMC Trucking, Inc.<br>A – Paystubs<br>B – Payroll Detail (excerpt)<br>C – Timesheets |
| Exhibit 166<br>(filed under seal) | GIS Inc.<br>A – Direct Deposits Detail<br>B – Employee Earnings Record (excerpt)<br>C – Paystubs<br>D – Timecard Report |
| Exhibit 167<br>(filed under seal) | GMR Trucking, Inc.<br>A – Paystubs<br>B – Quarter to Date Report (excerpts)<br>C – Timesheets |
| Exhibit 168<br>(filed under seal) | Gopher Courier Service Inc.<br>A – Employee Statement of Earnings (excerpt)<br>B – Timesheets |
| Exhibit 169<br>(filed under seal) | H&M Transportation<br>A – Payroll Summary (excerpts) |
| Exhibit 170 | Harborview Logistics, Inc.<br>Paystubs |
| Exhibit 171<br>(filed under seal) | Hartford Package, Inc.<br>A – Direct Deposit Voucher<br>B – Payroll Register (excerpt)<br>C – Paystub<br>D – Timesheets |
| Exhibit 172<br>(filed under seal) | Haynes Trucking, Inc.<br>A – Employee Earning Record (excerpt)<br>B – Payroll Journal (excerpt)<br>C – Paystubs<br>D – Timecard Report |

| | |
|---|---|
| Exhibit 173<br>(filed under seal) | Hemingway Couriers, Inc.<br>Employee Earnings Report (excerpt) |
| Exhibit 174<br>(filed under seal) | HP & E Inc.<br>Timesheet |
| Exhibit 175<br>(filed under seal) | HP Transportation, Inc.<br>A – Payroll History Report (excerpt)<br>B – Payroll Register Report (excerpt) |
| Exhibit 176<br>(filed under seal) | Impact Delivery Inc.<br>A – Direct Deposit Voucher<br>B – Employee Summary Earnings (excerpt)<br>C – Payroll Register (excerpt)<br>D – Timesheets |
| Exhibit 177<br>(filed under seal) | Iyengar Delivery Corp.<br>A – Paystubs<br>B – Payroll Details Report (excerpts)<br>C – Timesheets and Payroll<br>D – Weekly Timesheets |
| Exhibit 178<br>(filed under seal) | J. Mourao Inc.<br>A – Employee Earnings Record (excerpts)<br>B – Payroll Journal (excerpts)<br>C – Timesheet |
| Exhibit 179<br>(filed under seal) | J&L Packaging<br>Payroll Summary (excerpt) |
| Exhibit 180<br>(filed under seal) | JCA Delivery Inc.<br>Paystub |

| | |
|---|---|
| Exhibit 181<br>(filed under seal) | JEP Distribution Inc.<br>A – Doyle Paystubs<br>B – Doyle Timesheets<br>C – Flood Payroll Register (excerpt)<br>D – Payroll Register (excerpts) Employee Handbook |
| Exhibit 182<br>(filed under seal) | JOML Logistics, Inc.<br>Payroll Summary Report (excerpt) |
| Exhibit 183<br>(filed under seal) | JP Guthrie Inc.<br>A – Compliance Questionnaire<br>B – Employee Handbook<br>C – Paystubs<br>D – Employee Earnings Statement Record (excerpts) |
| Exhibit 184<br>(filed under seal) | JSA Enterprises Inc.<br>A – Earning Statements<br>B – Hours Summary Report |
| Exhibit 185<br>(filed under seal) | Judeko Inc.<br>Employee Detail Earnings (excerpt) |
| Exhibit 186<br>(filed under seal) | Krex Transport Inc.<br>A – Personal Earnings Statement<br>B – Compensation Detail Report (excerpt)<br>C – Paystubs<br>D – Employee Handbook<br>E – Timesheets |
| Exhibit 187<br>(filed under seal) | L&D Parcel Service Inc.<br>A – Employee Earnings Record (excerpt)<br>B – Payroll Journal (excerpt) |
| Exhibit 188<br>(filed under seal) | LBC Transport<br>Payroll Summary (excerpt) |

| | |
|---|---|
| Exhibit 189<br>(filed under seal) | Lexies Corp.<br>A – Compliance Questionnaire<br>B – Payroll Details Report (excerpts)<br>C – Paystubs<br>D – Timesheets |
| Exhibit 190<br>(filed under seal) | Light Enterprises<br>Compliance Questionnaire |
| Exhibit 191<br>(filed under seal) | Lima Courier Inc.<br>A – Direct Deposit Vouchers<br>B – Weekly Time Record |
| Exhibit 192<br>(filed under seal) | Lufeta Inc.<br>A – Earnings Statements<br>B – Payroll Details (excerpt) |
| Exhibit 193<br>(filed under seal) | M&F Delivery Inc.<br>A – Earning Statement<br>B – Payroll Details (excerpts)<br>C – Weekly Time Record Summary |
| Exhibit 194<br>(filed under seal) | M&M Logistics<br>Earning Record (excerpt) |
| Exhibit 195<br>(filed under seal) | Magnata Delivery<br>Paystubs |
| Exhibit 196<br>(filed under seal) | MGD Inc.<br>Email to FedEx Ground |
| Exhibit 197<br>(filed under seal) | MGM Delivery Services Inc.<br>A – Letter from MGM to FXG<br>B – Payroll Summary (excerpts) |
| Exhibit 198<br>(filed under seal) | Mid-Cape Ground Delivery Service Inc.<br>Earning Statements |

| | |
|---|---|
| Exhibit 199<br>(filed under seal) | MJR Delivery Inc.<br>A – Paystub<br>B – Employee Summary Earnings (excerpt)<br>C – Timecard |
| Exhibit 200<br>(filed under seal) | Nelson Delivery<br>A – Employee Time Cards<br>B – Payroll Register (excerpts)<br>C –Paystubs |
| Exhibit 201<br>(filed under seal) | Oz Van Transportation Inc.<br>Payroll Journal (excerpts) |
| Exhibit 202<br>(filed under seal) | PAPG Delivery Inc.<br>Payroll Journal (excerpts) |
| Exhibit 203<br>(filed under seal) | RCA Transportation Inc.<br>Payroll Details (excerpt) |
| Exhibit 204<br>(filed under seal) | RFL Delivery Inc.<br>Employee Summary (excerpt) |
| Exhibit 205 | Rigonato Delivery Inc.<br>Paystubs |
| Exhibit 206<br>(filed under seal) | RJ Fonseca Transport Inc.<br>A – Payroll Journal (excerpts)<br>B – Direct Deposit Voucher<br>C – Timesheets |
| Exhibit 207<br>(filed under seal) | RJM Express Inc.<br>A – Compliance Questionnaire<br>B – Employee Earnings Record (excerpts)<br>C – Payroll Journal (excerpt)<br>D – Paystubs<br>E – Timesheet |

| | |
|---|---|
| Exhibit 208<br>(filed under seal) | Rose & Belle Inc.<br>A – Earnings Record (excerpt)<br>B – Payroll Summary (excerpt) |
| Exhibit 209<br>(filed under seal) | Seidman Delivery Service, Inc.<br>A – Termination Notice Letter |
| Exhibit 210<br>(filed under seal) | Send-it-Safe Solutions, Inc.<br>A – Paystubs<br>B – Wage and Hour Records (excerpts) |
| Exhibit 211<br>(filed under seal) | Shocck Inc.<br>A – Hourly Worksheet<br>B – Paystubs |
| Exhibit 212<br>(filed under seal) | SJF Trucking Inc.<br>Wage and Tax Register |
| Exhibit 213<br>(filed under seal) | SJS Transportation Corp.<br>A – Payroll Details (excerpt)<br>B – Payroll Summary (excerpt)<br>C – Timesheets |
| Exhibit 214<br>(filed under seal) | SSS Transportation Inc.<br>Payroll History Report (excerpts) |
| Exhibit 215<br>(filed under seal) | Swan & Associates Inc.<br>Payroll Summary (excerpts) |
| Exhibit 216<br>(filed under seal) | Tern Couriers Inc.<br>Compliance Questionnaire |
| Exhibit 217<br>(filed under seal) | Tri-K Trucking Inc.<br>Worksheets |
| Exhibit 218<br>(filed under seal) | Up From the Ground Inc.<br>Payroll Records (excerpt) |

| | |
|---|---|
| Exhibit 219<br>(filed under seal) | US Delivery Group – NE, Inc.<br>A – Payroll Details (excerpts)<br>B – Paystubs |
| Exhibit 220<br>(filed under seal) | US Group Transportation Inc.<br>Timesheets |
| Exhibit 221<br>(filed under seal) | Wild 57's, Inc.<br>A – Check History Detail (excerpts)<br>B – Paystubs<br>C – Timesheets |
| Exhibit 222<br>(filed under seal) | Workhorse Trucking Inc.<br>Wage and Hour Reports (excerpt) |

## INTRODUCTION

Despite being the moving party, FedEx Ground need not prove that the conditionally-certified collective must be decertified. Rather, it is Plaintiffs' burden to prove that they and the roughly 500 opt-ins are in fact similarly situated, with respect to their claimed FLSA violations, and to prove in fact that their liability and damages claims can be tried through representative evidence. At this stage, their joint employment theory is not enough to bind a collective together. Joint employment, like direct employment, neither violates the FLSA nor establishes any liability. If the mere fact of joint employment were enough, every putative collective brought against a single, direct employer would automatically be entitled to final certification. That is not the law. Instead, if members of an overtime-pay collective are not similarly situated when it comes to an FLSA-violating pay practice—if liability and damages will need to be individually proven—the law requires denial of final certification.

This is not just FedEx Ground's argument; it is the unanimous conclusion of six courts that have addressed collective or class certification in similar cases against FedEx Ground in the last two years.[1] Despite more than six years of discovery in this case and others, no plaintiff has even identified, let alone proven, a common FedEx Ground policy or practice that has led to the

---

[1] *Oglesby v. FedEx Ground Package Sys., Inc.*, No. 3:20-cv-346, 2023 WL 4740160, at *3-5 (S.D. Ohio July 25, 2023) (denying FLSA conditional certification in joint-employment case); *Aristizabal v. FedEx Ground Package Sys., Inc.*, No. 1:22-cv-00529-MSN-LRV (E.D. Va. Feb. 3, 2023) (same) (Scott Decl. ¶ 4 & Ex. B (Order & Excerpts of Hr'g Tr.)); *Corley v. FedEx Ground Package Sys., Inc.*, No. 5:19-cv-00429, 2022 WL 1805435 (C.D. Cal. June 2, 2022) (denying Rule 23 certification in case with misclassification and joint-employment allegations); *Overpeck v. FedEx Corp.*, No. 18-cv-07553, 2022 WL 888441 (N.D. Cal. Mar. 25, 2022) (denying Rule 23 certification in joint-employment case); *Lightfoot v. Wahoo Logistics, Inc.*, No. FCS050578 (Cal. Superior Ct., Solano Cty. Feb. 2, 2022) (same) (Scott Decl. ¶ 3 & Ex. C.); *Hinds v. FedEx Ground Package Sys., Inc.*, No. 18-cv-01431, 2021 WL 4926980 (N.D. Cal. Aug. 18, 2021) (same); *see also Nelson v. FedEx Ground Package Sys., Inc.*, No. 18-cv-01378, 2018 WL 6715897 (D. Colo. Dec. 21, 2018) (denying FLSA conditional certification in joint-employment case), *R&R adopted*, 2019 WL 1437765, at *4-5 (D. Colo. Feb. 8, 2019).

same or similar law-violating wage practices of independent Service Providers that employ the plaintiff drivers. That is because no such policy exists. All evidence, including that gathered from the drivers themselves, shows they are (and have been) subject to different wage-and-hour practices by their actual employers, over 160 Service Providers.

The two named Plaintiffs—Justin Trumbull and Jordan Roy—may have valid overtime claims against their employing Service Provider, Up From the Ground, but they are not at all representative of the discovery opt-ins, let alone similarly situated to the entire collective. Both worked for only one Service Provider, for less than two years each, at the same time as each other, out of one location. The opt-ins worked for 160 other Service Providers, at 23 other locations, for different durations, and at different times.

Nor are Roy and Trumbull competent to testify about the experiences of other drivers. Despite swearing in support of conditional certification that they observed other drivers working overtime without being paid for it, both disclaimed any such knowledge when deposed. They admitted they were not aware what hours others worked, did not even know what other drivers at Up From the Ground were being paid, and did not know what other drivers for other Service Providers were being paid (yet admitted that they thought at least some Service Providers paid hourly and overtime). Indeed, they testified that all Service Providers paid differently:

- Roy: "So I know that <u>contractors were – were all over the place in terms of what they paid their employee or employees</u>." (Roy Dep. 115:18-20 (emphasis added).) Later, regarding the 30-40 drivers he referenced in his affidavit: "Q. And your knowledge is that they were paid differently than you were; correct? A. Yeah. Q. And differently from each other as well; right? A. Yeah." (*Id.* 316:25-317:4.)

- Trumbull: "Q. Do you have any knowledge of whether other service providers in the building did things differently from Up From the Ground? A. . . . I never spoke to another contractor personally and asked him the fine details, but obviously you hear employees talking and . . . every private contractor was different. <u>Everybody did it different</u>. You know, maybe they had different issues with their private contractor.

> Me and Jordan [Roy] solely relied on what we dealt with personally through our private contractor." (Trumbull Dep. 63:17-64:5 (emphasis added).)

This, by itself, requires denial of final certification (and calls into significant question the bases for conditional certification). But there is more.

Substantial and widespread differences among Plaintiffs and opt-ins impact every legal and factual inquiry needed to determine liability here—including joint employment. Plaintiffs and opt-ins, in fact, report vastly different experiences with FedEx Ground that preclude the blanket, collective-wide analysis and determination Plaintiffs want on that issue (and others). The evidence shows, among other differences:

- opt-ins that had no substantive contact with FedEx Ground personnel and disclaimed any allegation that FedEx Ground controlled their work;
- opt-ins that claim to have been actively managed by FedEx Ground personnel;
- opt-ins that rarely, if ever, drove light vehicles and so were not entitled to overtime;
- opt-ins that might have been entitled to overtime pay working for a certain Service Provider but not others (in fact, several say they are not "making a claim" for the time they worked for certain Service Providers because they were admittedly paid properly);
- opt-ins that worked only part-time for large periods of time;
- opt-ins that functioned as managers for their Service Providers, directed by their Service Providers not only to manage the activities and schedules of other drivers (some of whom are also opt-ins), but also to interact directly with FedEx Ground on behalf of the Service Provider, per the Service Providers' instructions;
- opt-ins that claim they were not paid overtime, yet their paystubs show overtime pay;
- opt-ins that dispute the amount of heavy vehicles they drove; and
- opt-ins that falsified Department of Transportation (DOT) Hours of Service records, due to their own choice or pursuant to instructions by their Service Providers.

Plaintiffs cannot evade these individualized issues by saying these are mostly "damages" issues that should not be considered for final certification. As Judge Colville aptly observed,

> Plaintiffs, somewhat confusingly, suggest that the issue of whether the opt-ins were paid overtime relates only to damages, and that the same is completely divorced from, and unrelated to, liability in this matter. . . . Plaintiffs assert that FedEx *has violated the FLSA in this case by not paying overtime compensation* . . . . [T]he Court finds that Plaintiffs' blanket assertion respecting the purported irrelevance of overtime generally is overstated . . . .

*Claiborne* Mem. Op. at 18 n.8 (emphasis by court) (Ex. A to Scott Decl.); *see also Hinds*, 2021 WL 4926980, at *10 ("[T]o determine FedEx's liability for the alleged violations, a fact finder would be required to consider whether a putative class member worked for an ISP that paid overtime . . . . Because this is not a misclassification case, the Court also concludes that these issues go to the fact of liability and not merely the amount of damages . . . .").

Nor can Plaintiffs point to FedEx Ground contracts and "policies" as purportedly unifying the collective. As one court recently recognized, they cannot show "that any FedEx policy, plan or decision <u>affected the drivers' alleged failure to receive overtime payments</u> as required under the FLSA." *Oglesby*, 2023 WL 4740160, at *4 (emphasis added).

To try a case on a representative basis means that circumstances amongst the entire group are so similar that a small number of individuals can represent all others, making it unnecessarily cumulative and duplicative to present evidence as to everyone. But whether focused on the 50-100 discovery opt-ins, or the two Plaintiffs, there is no consistency: the evidence instead shows that significant differences exist and that any attempt to use any one or group of them as "representative" would be fruitless, procedurally and substantively unfair, impossible to manage cohesively, if at all, and violate the standards for certification.

The Court should reject Plaintiffs' invitation to deviate from what is becoming a long line of decisions denying certification—an invitation particularly fraught in a case involving the pay policies of over 160 different Service Providers over the course of an over eight-year period.

# STATEMENT OF FACTS[2]

## I. SERVICE PROVIDERS EMPLOY PLAINTIFFS AND OPT-INS AND MAKE ALL EMPLOYMENT DECISIONS

### A. FedEx Ground Contracts with Independent Businesses in Massachusetts to Provide Package Pickup and Delivery Services

FedEx Ground is a federally-registered motor carrier that offers package pickup, delivery, and information services across the United States. Customers contract with FedEx Ground for those services. FedEx Ground, in turn, contracts with independent businesses (Service Providers) to provide pickup and delivery services between customers and FedEx Ground's sorting stations. Plaintiffs and the opt-ins worked for more than 160 Service Providers in 24 stations over the more than eight years at issue (back to February 2015). (Rosales Decl. ¶ 7.)

Service Providers negotiate a business-to-business contract ("Agreement") with FedEx Ground. (Rosales Decl. ¶ 8; Pierce Dep. 37:14-38:4.) While there are standard base agreements (which have changed over the relevant period), Service Providers still negotiate material terms, like the amount FedEx Ground will pay for services provided (their "settlement"), the maximum volume of packages the Service Provider agrees to deliver each day, and the Agreement's duration. (Pierce Dep. 31:1-24, 36:18-39:18; Blais Dep. 21:21-22:7.) Service Providers also decide whether to opt into brand promotion programs, in which they agree to display FedEx Ground logos on vehicles or clothing for additional contract payments. (Linder Dep. 51:3-15; Pierce Dep. 31:13-32:-22.) Some participate only as to clothing; others participate only as to some, but not all, of their vehicles; and some do not participate at all. (Rosales Decl. ¶ 10.)

### B. Service Provider Owners Decide How to Operate Their Businesses

Service Provider owners make their own decisions about the size and structure of their

[2] All appendices and exhibits, including short form references and exhibit numbers, are identified in the Table of Appendices and Exhibits provided above.

business and operations. Some Service Providers provide services in multiple states. (Bracken Decl. ¶ 2.) Some provide services for other entities, like Amazon or On Trac. (Pierce Dep. 156:9-21; Mendonca Dep. 129:6-15; Therrien Dep. 68:23-69:16.) Some create and distribute employee handbooks. (*E.g.*, Bracken Decl. ¶ 7 & Ex. A; Leandres Decl. ¶ 9; Haley Decl. ¶ 10.) Many provide employment benefits. (Bracken Decl. ¶ 24; Oliveira Decl. ¶ 12; *see also* App. B.)

Service Providers also decide how to perform the services they provide to FedEx Ground. Service Providers have "sole and complete discretion in the staffing, selection, hiring, training, supervision, assignment, hours and days worked, discipline, termination, compensation, benefits, and all other terms and conditions of employment." (Rosales Decl. ¶ 13.) FedEx Ground also agrees that "[n]o officer, agent, or employee of FXG [] has authority to" direct the Service Provider's personnel as to "the methods, manner or means employed" in providing services. (*Id.*) FedEx Ground station personnel are trained on these terms to ensure they understand they cannot manage, supervise, or discipline Service Providers' drivers or dictate how they do their work. (*Id.* ¶ 14 & Ex. B (Policy 007); Pierce Dep. 76:12-23, 79:14-80:23, 114:15-115:6, 152:10-154:9.)

Consequently, Service Providers make all decisions regarding their businesses, including:

- how many and what types and sizes of trucks to operate, and when;
- which drivers will drive which trucks, and when;
- how many drivers, helpers, managers, and other personnel to employ;
- how to design the delivery routes for their contracted areas;
- which drivers will drive which routes, and when;
- how to organize and assign their packages each day across their routes and drivers;
- their drivers' hours and schedules, and how to track those hours;
- how to pay their employees, and how much; and
- whether to use FedEx Ground logos on their vehicles and employees' clothing.

(*E.g.*, Linder Dep. 69:19-23 (route design); Rosales Dep. 19:24-20:6, 89:5-91:3 (same); Bracken Decl. ¶¶ 10, 20-26; Brahmbhatt Decl. ¶¶ 4, 6; Berger Decl. ¶ 4; Esteireiro Decl. ¶¶ 12-13; Leandres Decl. ¶¶ 5-8; Oliveiro Decl. ¶¶ 7-8; App. E.) Service Providers also make decisions regarding recruiting, hiring, discipline, and termination of their employees. (*See, e.g.*, Bracken Decl. ¶ 22; Brahmbhatt Decl. ¶ 4; Oliveiro Decl. ¶¶ 4, 14; App. E.) Drivers, in turn, raise employment issues with their Service Providers, not with FedEx Ground. (*See* App. E.)

Because Service Providers make all of these decisions based on what makes most sense for their businesses, they of course operate differently from each other. Appendix B identifies the ways in which implicated Service Providers differ just with respect to employment issues, like pay methods, management and operations, benefits, and how they record compensable hours.

## II. THE EMPLOYMENT SETTINGS AMONG PLAINTIFFS AND OPT-INS DIFFER IN MATERIAL RESPECTS

A total of 463 opt-ins remain in this case, and the pertinent period spans more than eight years. During that time, Plaintiffs and opt-ins worked in disparate employment settings for 160-plus Service Providers at 24 stations. (Rosales Decl. ¶ 7.) Plaintiffs and opt-ins admit their Service Providers interviewed, hired, paid, and (sometimes) fired them. (App. E.) And these Service Providers, not FedEx Ground, made all employment decisions, including: how and what to pay Plaintiffs and opt-ins, what days they worked, when they should arrive for work, whether and how to record the hours they worked, what vehicles they drove, what routes they covered, whether their assigned duties included managerial or supervisory tasks, and more. (*Id.*)

Because the 160-plus Service Providers set their own policies and controlled the terms and conditions of the opt-ins' employment, there are substantial differences in work experiences. Appendices A and D summarize key factual differences among Plaintiffs and opt-ins. Appendices B and C summarize key factual differences among Service Providers and their pay practices.

### A. Service Providers Pay Plaintiffs and Opt-Ins Different Ways and Amounts

There is no dispute that Service Providers not only pay Plaintiffs and opt-ins but choose how to pay them and whether to pay overtime, subject only to the contractual agreement to comply with state and federal labor laws. (*See, e.g.*, Rosales Decl. ¶ 21 & Ex. A, Agreement § 6.2); Bracken Decl. ¶¶ 10, 15; App. E.) FedEx Ground is not involved in these decisions. (Brahmbhatt Decl. ¶ 6; Berger Decl. ¶ 8; Esteireiro Decl. ¶¶ 13-14; Oliveira Decl. ¶¶ 9-11.)

Up From the Ground paid Roy and Trumbull a per-stop rate. (Roy Dep. 74:4-12, 114:15-16; Trumbull Dep. 133:22-134:5.) But Service Providers paid opt-ins in a wide variety of other ways, too: (1) hourly; (2) other piece-rate units (per package or stop); (3) flat day rates; (4) flat weekly salaries; (5) discretionary and non-discretionary bonuses; and (6) combinations of some or all of these. (*See* App. A (identifying ways Plaintiffs and opt-ins are paid); Apps. B & C (showing pay methods by Service Provider).) Of the discovery opt-ins, 21 reported being paid in various ways over time and across Service Providers (including hourly plus overtime); 24 reported being paid only by piece rates (per package or per stop); 8 reported being paid only by weekly salary (and one an annual salary); 9 reported being paid only by day rate; 2 reported being paid only hourly; and 2 reported being paid only based on a day rate plus additional per-stop pay. (App A.) And, <u>as to the remaining 400-plus opt-ins, we simply do not know</u>.

Numerous opt-ins say their pay differed, in both rate and method, from Service Provider to Service Provider. (*See* App. A.) For example, opt-in Harrell says he was paid five different ways by the six Service Providers he worked for: (1) per-stop rates ranging from $1.25 to $1.50; (2) an hourly rate that he cannot recall; (2) a day rate of $260; (4) a day rate with additional per-stop pay; and (5) a variable formula he negotiated with a Service Provider. (App. A.)

The record also reveals pay variances <u>within</u> a single Service Provider, either over time, across drivers, or both. Opt-in Sattler says his Service Provider paid him differently—either

hourly, hourly plus a per-stop rate, hourly plus a day rate, or a flat day or weekly rate—depending on the route he drove, which changed often. (App. A; Sattler Dep. 51:19-52:16.) Service Provider Eagle Eye paid opt-in Pilotte a day rate plus a per-stop rate or just a per-stop rate if he made more than 150 stops. (App. A.) Other opt-ins report that Service Providers changed their method or rate of pay during their employment. (*See* App. A (e.g., Reid (pay changed from per-stop to daily to hourly); Howland (pay changed from daily to per-stop); Santos (pay from Lima Courier went from per-stop to weekly salary); *cf.* Bracken Decl. ¶ 10 (Service Provider changed from paying daily to hourly rates); Oliveira Decl. ¶ 11 (Service Provider changed safety bonus from a monthly bonus to a bi-annual bonus).) And Plaintiffs' employer, Up From the Ground, paid Roy and Trumbull by the stop, while it paid opt-ins Eddington and Flowers a day rate. (App. A.)

Plaintiffs also differ in whether they received overtime pay. Both Roy and Trumbull claim they never received overtime pay, but admit they were aware that drivers working for other Service Providers at the same location were paid hourly and received overtime. (Roy Dep. 115:12-20, 259:18-24; Trumbull Dep. 151:8-23.) Consistent with this, numerous discovery opt-ins admit they were paid overtime. (App. A (Sattler, Reid, Doyle).) Additional evidence also shows that Service Providers pay overtime. (Bracken Decl. ¶¶ 15-16 & Ex. A at 34 (nonexempt, hourly employees are paid overtime); Berger Decl. ¶ 6 (same); *see also* App. A (Marzilli, Eddington, Flood, Harrell); Apps. B & C (e.g., ABL Enterprise Corp., Bellaire Enterprises, D&S Delivery, GIS Inc., Haynes Trucking, Lexies Corp., RFL Delivery).)

### B. Plaintiffs and Opt-Ins Worked Different Schedules and Varying Hours Set by Their Different Service Providers

Plaintiffs and opt-ins worked different schedules and hours based on their own personal circumstances and the Service Providers for whom they worked. Service Providers, not FedEx Ground, set their schedules and told them when to arrive for work (or otherwise left that decision

to the drivers' discretion). (*See* App. E.) Service Providers also designed their service areas into various routes, based on multiple factors, including volume, and then decided how to assign those routes to their drivers. (*Id.*; Oliveira Decl. ¶ 8; Haley Decl. ¶ 16.)

As a result, Plaintiffs' and opt-ins' weekly hours varied significantly. Opt-ins admit they worked different hours from week to week and Service Provider to Service Provider. (*E.g.*, Neto Dep. 38:2-4, 153:20-22; Flowers Dep. II at 43:2-5; App. D.) Their self-reported estimates of the average hours they worked range from 40 to 115 hours per week. (App. D.) Scanner data reflects even more significant disparities in "on-duty" time, showing anywhere from less than 10 hours to up to 100 hours per week.[3] (*Id.*) This wide-ranging variability exists both across opt-ins and within a single opt-in's experience, with little (if any) consistency across Service Providers. (*Id.*)

### C. Opt-Ins Drove Light Vehicles (If at All) for Different Amounts of Time During Their Employment with Service Providers

The extent to which Plaintiffs and opt-ins drove known light vehicles varies dramatically, ranging from zero to over 95 percent of their total driving time. (*Compare* Therrien Summary Data[4] (no known light-vehicle use), *with* Taylor Summary Data (nearly all known light-vehicle use).) Roy and Trumbull consistently drove light vehicles throughout their employment. (Roy Summary Data; Trumbull Summary Data.) But others drove them intermittently. Some opt-ins had short periods of consistent light-vehicle use interspersed with lengthy periods of highly

[3] *See* Facts, § III.A. On-duty time over 70 hours would be a DOT violation. 49 C.F.R. § 395.3(b). Scanner data showing excessively high on-duty time tends to reflect obvious errors. For example, opt-in McDonald's scanner data shows 94 hours of on-duty time for the week ending May 29, 2016, but has two overlapping entries for May 27, 2016. (McDonald Summary Data.) Opt-in Reid's scanner data reflects the same problem for the week ending May 14, 2017. (Reid Summary Data; Reid Dep. 180:15-20 (cannot explain double entry in scanner data).)

[4] "Summary Data" refers to data produced by FedEx Ground that combines some information from scanner data with vehicle and GVWR information obtained from the separate Vehicle Maintenance System (VMS) database.

sporadic (if any) light-vehicle use. (*E.g.*, Mulvey Summary Data; Santos Summary Data.) Some opt-ins rarely drove light vehicles but still exceed the one percent mark Plaintiffs argue should be the *de minimis* threshold. (*E.g.*, Barry Summary Data (4 days); Torra Summary Data (5 days).) And still others drove rental vehicles so frequently that we do not know what size vehicles they drove. (*E.g.*, Hollister Summary Data; Bernasconi Summary Data.)

Opt-ins' use of light vehicles also varies both across and within Service Providers. Some Service Providers do not own light vehicles, so any light-vehicle use by their drivers would be limited to rental vehicles, <u>if</u> it rented light vehicles. (App. B (Coastal Package, DL Delivery, EJS Delivery).) Others have mixed fleets of varying composition. (Oliveira Decl. ¶ 7 (33 heavy and 4 light); Haley Decl. ¶ 6 (27 heavy and 3 light); *see also* App. B.) Some opt-ins drove light vehicles for all or the majority of their employment with one Service Provider, but then drove no light vehicles, or drove them sporadically, when employed by a different Service Provider. (App. A (e.g., Barros, Marzilli, Cantin, Eddington, Fowler, Infante, Lima).) Even opt-ins employed by the same Service Provider had different experiences, with some driving almost all light vehicles for a Service Provider while others drove almost all heavy vehicles. (*See* App. A (*compare* Monahan (mostly light for Eagle Eye), *with* Barry (mostly heavy for Eagle Eye).)

### D. Opt-ins Report Different Work Conditions and Experiences from Service Provider to Service Provider

Plaintiffs worked as drivers for only one Service Provider, Up From the Ground. But many opt-ins worked for multiple Service Providers and reported having different experiences and duties from one Service Provider to another. (*See* App. A.)

Opt-ins' testimony and questionnaire responses show they worked different hours and received different pay depending on the Service Provider. (*See* Apps. A & D.) But they report other differences, too. Opt-ins testified that Service Providers had different management styles,

different priorities, and different levels of sophistication. (*See* Marzilli Dep. 116:10-117:7; Neto Dep. 105:21-107:19, 116:7-22; Therrien Dep. 71:2-13.) They expressed a preference for one Service Provider over another. (Mendonca Dep. 130:2-20; Therrien Dep. 59:21-60:25.) They also described variances in the types of routes they drove for different Service Providers. (Neto Dep. 106:20-24; Mendonca Dep. 163:20-24; Therrien Dep. 62:9-63:15.)

Their assigned duties also varied. Many opt-ins said they were assigned supervisory or management-related duties, though these varied in scope and formality. Flowers says he chose to work for one Service Provider because he was hired as a manager. (Flowers Dep. I at 68:24-69:3.) Several opt-ins served as "Business Contacts" for Service Providers, meaning the Service Provider appointed them to act as an official liaison with FedEx Ground personnel under the Service Provider's Agreement. (Julio Dep. 44:10-14; McDonald Dep. 51:21-24; Robertson Dep. 51:12-19.) Other opt-ins testified that Service Providers assigned them some supervisory duties on an unofficial or temporary basis. (Reid Dep. 31:10-15; Monahan Dep. 39:20-41:12; Sattler Dep. 79:11-18, 81:17-19.) These opt-ins acknowledged they performed different duties and acted in a different capacity as a Business Contact or manager than when working solely as a delivery driver. (Julio Dep. 49:23-25 (his "job as a BC was not very typical of what most drivers were doing"); *see also id.* at 46:13-47:14, 52:25-53:10, 72:9-15, 86:8-10; Sattler Dep. 79:19-80:22; Flowers Dep. II at 120:12-122:10; McDonald Dep. 238:11-16; Reid Dep. 31:16-32:5.)

### E. Opt-ins' Experiences and Interactions with FedEx Ground Personnel Differ

Plaintiffs and opt-ins also present widely varying accounts of how FedEx Ground allegedly controlled or supervised their work, <u>if at all</u>. (*See* App. A.) For example:

- **Interaction with FedEx Ground managers.** Opt-ins reported speaking with FedEx Ground managers regularly, occasionally, or not at all. (App. A (*compare* Marzilli, McDonald, Robertson (regular substantive interaction), *with* Barros, Moore, Monahan (occasional substantive interaction), *with* Dillon, Dean, Mendonca, Sattler (rare, if any, substantive interaction)).) Some opt-ins claim FedEx Ground personnel

contacted them when they were out delivering packages (*e.g.*, Pilotte Dep. 206:21-207:6), while others said FedEx Ground never contacted them (*e.g.*, Lessard Dep. 117:21-119:4). Several opt-ins reported varying interactions—in both quantity and substance—over the course of their employment with Service Providers, depending on when they provided services, what station they were at, and what role they were serving in. (McDonald Dep. 48:1-14, 54:4-56:12, 79:1-82:16 (describing different interactions with two different station managers); Julio Dep. 45:23-46:24, 72:9-15, 74:16-75:7 (describing difference in nature and quantity of contact with FedEx Ground when acting as Business Contact).)

- **Supervision and control.** Numerous opt-ins disclaimed any allegation that FedEx Ground supervised them or exerted control over their job performance. (App. A (e.g., Dean, Dillon, Flowers, Odierno, Sattler, Mendonca).) But others claim FedEx Ground's supervision and control was pervasive. (*Id.* (Davis, Robertson, Wheelock-Graves).)

- **FedEx Ground-branded clothing.** Dean said her Service Provider, Seidman Delivery Service, gave her a choice on whether to wear FedEx Ground-branded clothing and she chose not to wear a uniform. (Dean Dep. 147:23-148:22 ("Q. So you did not actually wear a uniform with FedEx Ground's logo on it? A. I did not.").) But Flowers testified that Seidman told him that wearing FedEx Ground-branded clothing was required. (Flowers Dep. I at 37:20-38:4.) Wheelock-Graves said "many" Service Providers did not require their drivers to wear FedEx Ground uniforms, and instead "had their guys going out in tank tops and jeans." (Wheelock-Graves Dep. 300:25-301:5, 302:16-18.) Yet some opt-ins claim FedEx Ground personnel directed them to wear FedEx Ground-branded clothing. (App. A (Roy, Barros, Julio).)

- **Safety meetings.** Some opt-ins claim they attended regular safety meetings held by FedEx Ground, but they provided inconsistent testimony on whether FedEx Ground personnel instructed them to attend these meetings and whether they were mandatory. (Roy Dep. 56:7-10, 262:23-263:16; Julio Dep. 93:11-94:23; Monahan Dep. 53:15-17, 56:6-22, 238:11-14.) Other opt-ins, however, reported that their Service Providers held regular safety meetings. (Therrien Dep. 251:10-253:23; Sattler Dep. 90:3-92:7, 93:23-94:5.) Still others testified they didn't attend any safety meetings at all, or at least not when working out of certain stations. (Marzilli Dep. 79:11-80:20, 110:24-111:2, 126:17-127:10; Barros Dep. 86:19-25.)

Testimony by McDonald, in which he described his experiences with FedEx Ground managers at two different stations, illustrates the different experience even a single driver could have. McDonald worked for two Service Providers: M&M Logistics, Inc. (Ground delivery out of the Auburn station), and Seidman (Home Delivery out of the Northborough station). (McDonald Dep. 9:13-19, 48:1-3, 53:19-21, 174:20-24.) McDonald testified that he did not recall the station manager at Auburn (Dan) giving him instructions on his appearance, a vehicle's

appearance, or how to perform his job. (*Id.* at 48:1-14, 123:13-124:4, 147:6-14, 157:23-158:8, 176:16-22.) But he claims a manager at the Northborough station (Bob) regularly instructed him and other drivers on a variety of matters, from covering routes to wearing shoes of the appropriate color. (*Id.* at 79:1-80:11, 146:22-148:13, 157:23-158:11, 165:17-24, 234:1-9.)

## III. SERVICE PROVIDERS MAINTAIN ALL EMPLOYMENT RECORDS

### A. FedEx Ground Does Not Maintain a Record of Drivers' Compensable Time

The DOT Hours of Service regulations require commercial drivers to record "on duty" and "off duty" time. When compliant with regulations, "on duty" time is generally broader than compensable time; it includes "all time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work." 49 C.F.R. § 395.2.

The records FedEx Ground maintains to comply with these regulations ("scanner data") capture only on-duty time. On-duty time does not stop running for <u>any</u> breaks taken during the day, even if the driver runs personal errands or stops for lunch—as numerous opt-ins reported they did. (App. A (Mendonca, Reid, Sattler, Roy, Vander Brug).)

To capture compensable time worked, Service Providers use various means of tracking and recording employee hours. (*See* App. B.) Some have drivers record their time using a time-keeping app or time clock. (*Id.* (e.g., BBJM Mgmt., Coastal Package, DL Delivery, MNK Logistics).) Others rely on handwritten timesheets. (*Id.* (e.g., JEP Distribution, EMC Trucking, Rigonato).) The record also reflects printed timesheets from Service Providers. (*Id.* (e.g., BLF Courier, Lexies Corp.).) In contrast, Plaintiffs report their Service Provider, Up From the Ground, did not have them track their hours. (*E.g.*, Roy Dep. 166:6-8; Trumbull Dep. 106:10-14.)

Other evidence confirms scanner data is not a proxy for compensable time. Opt-in Doyle's timesheets do not match the on- and off-duty times reflected in his scanner data—with Doyle's

self-recorded compensable time generally being greater. (*Compare* Doyle Timesheets (JEP Distribution Inc.) (for period of Mar. 1, 2020, to Apr. 3, 2020), *with* Doyle Summary Data (showing on- and off-duty times for same period).) Doyle's paystubs reflect payment for the hours recorded on his timesheets. (*Compare* Ex. Doyle Timesheets (JEP Distribution Inc.) (same period), *with* Doyle Paystubs (JEP Distribution Inc.) (same period).)

Plaintiffs and opt-ins also disagree on whether the on-duty time shown in their scanner data accurately reflects the hours they worked, as well as why and to what extent. Some opt-ins admit the on-duty time reflected in their scanner data may be overinclusive, but for different reasons. For instance, opt-in Dean admitted her scanner data does not accurately reflect her work hours because she did not have a consistent practice of when (or even if) she logged <u>off</u> the scanner. (Dean Dep. 135:2-138:12.) Opt-in Pilotte says he drove his Service Provider's vehicles home, so that his commute home is captured in his on-duty time, though he admits such time is not compensable. (Pilotte Dep. 160:1-5, 161:3-9.) But many opt-ins claim the scanner data underreports their compensable time, for many different reasons and to various extents—with the amount of unreported time ranging from 10 minutes to up to four hours a day to multiple weeks at a time. Examples of these problems abound:

- Roy testified that his Service Provider instructed him to enter 7:00 a.m. as his on-duty time, though he initially arrived at the station around 6:00 or 6:30 a.m. (Roy Dep. 127:5-128:11.) Roy later began arriving around 7:00 a.m., but admits there were days where he actually arrived around 6:50 a.m. and others where he arrived around 7:15 a.m. (*Id.* at 211:17-212:9, 224:12-20; *cf.* Roy Summary Data.)

- Trumbull said his Service Provider told him to enter an on-duty time of 7:00 a.m., but he still chose to arrive at the station and begin working around 6:00 a.m. regardless. (Trumbull Dep. 198:13-16, 223:19-224:13.) According to Trumbull, his scanner data fails to account for at least one hour of work each day until later in his employment when he began logging into the scanner as on-duty when he arrived at the station. (*Id.* at 114:1-25, 224:16-225:6; Trumbull Summary Data (entries beginning 12/12/16).)

- Numerous opt-ins claim they worked one or more hours before their recorded on-duty times. (App. A (Barros, Flowers, Lessard, Mendonca, Moore, Pilotte, Robertson,

Wheelock-Graves).)

- Several opt-ins claim they were assigned managerial duties during some portion (though not all) of their employment. (Julio Dep. 44:10-45:10; McDonald Dep. 51:21-52:11; Wheelock-Graves Dep. 75:14-76:2.) Because scanner data records a driver's on-duty time to comply with DOT regulations, time spent performing other duties may not be reflected in these opt-ins' data, particularly if they did not drive every day of their employment. (*See* App. A (Julio, McDonald, Wheelock-Graves).)

- Some opt-ins claim their scanner data is missing entries for multiple days or even weeks, but cannot explain why those dates do not appear. (Dean Dep. 183:9-184:16, 187:20-188:3; Pilotte Dep. 176:16-177:20, 194:10-196:25; Flowers Dep. II at 15:3-16:11; Wheelock-Graves Dep. 61:8-23.)

- Opt-in Davis believes the on-duty times shown in his scanner data are inaccurate, though he does not know why. (Davis Dep. 156:8-158:9, 168:20-169:11, 179:7-14.) He also says his off-duty times may not reflect the end of his work day because he often performed additional work after logging off his scanner. (*Id.* at 180:24-182:15.)

In contrast, other discovery opt-ins do not challenge the accuracy of the on-duty times reflected in their scanner data. (App. A (Dillon, Neto, Odierno, Reid, Sattler).) Appendix A summarizes the available evidence on the opt-ins' reports as to whether their on-duty time is accurate. There is no available evidence on what non-deposed opt-ins would say about the accuracy of their data.

### B. FedEx Ground Has Limited Access to Drivers' Wage and Hour Records

Under the Agreement, Service Providers maintain their own employment records. (Rosales Decl. ¶ 22 & Ex. A (Agreement § 6.2(C)).) FedEx Ground has limited access to these records. While it performs random, and sometimes targeted, compliance assessments of Service Providers, primarily to ensure they are compliant with applicable law, the Agreement permits FedEx Ground to request only what it needs to confirm compliance. (*Id.*) When FedEx Ground conducts a wage-and-hour assessment, it usually requests four weeks of payroll information, W-2 forms, and some other documents (e.g., I-9 verifications). (*Id.* ¶ 23.) FedEx Ground thus has limited information for those Service Providers that have been assessed, and nothing for those that have not.

Opt-ins and some Service Providers have provided patchy and incomplete records for this

case, so there is only piecemeal documentation available. Some opt-ins produced paystubs for only a few weeks or months. Some produced only W-2s. Some Service Providers provided payroll summaries or other documentary evidence reflecting an opt-in's compensation, but not paystubs showing hours or how pay was calculated. Some provided incomplete timesheets for opt-ins. And much of the available documentary evidence is itself unclear. (*See, e.g.*, Paystub (CJ Delivery Service) (reflecting "commission" pay of $334.50 without reference to hours or rate).) Thus, for most opt-ins, there is no clear documentary evidence showing (1) how they were paid, (2) what they were paid, or (3) the compensable time they worked, meaning evidence of these crucial facts is limited to their own recollections (which many of the deposed admit are themselves flawed), if even that (i.e., there is no such evidence in the record for well over 300 non-discovery opt-ins). Appendix C summarizes the limited available evidence regarding pay practices for the implicated Service Providers.

### C. FedEx Ground Has Incomplete Information Concerning Vehicle Weight

FedEx Ground also has incomplete information about the Gross Vehicle Weight Rating (GVWR) for the vehicles drivers used because they are Service-Provider-owned vehicles. (Newmont Decl. ¶ 4.) If a Service Provider does not provide the GVWR for its vehicles in the Vehicle Maintenance System (VMS), FedEx Ground does not have that information. (*Id.* ¶ 6.) Nor does FedEx Ground have weight information for rental vehicles, which Service Providers regularly use for various reasons; VMS does not contain information on rentals. (*Id.* ¶ 7; Newmont Dep. 19:20-20:7, 36:3-7.)

Further, vehicle weight is not captured by drivers' scanners; instead, the driver enters a unique number for the vehicle the driver is operating on a given day. (Rosales Decl. ¶ 28.) To determine GVWR for that vehicle, the vehicle number must be cross-referenced against VMS in an attempt to locate that information, if the Service Provider has provided it. (Newmont Decl.

¶ 6.) If a driver enters the vehicle number incorrectly, the vehicle cannot be located. (*Id.* ¶ 8.)

The record reflects these information gaps, even after cross-referencing vehicle numbers in VMS. Both named Plaintiffs drove vehicles with unknown GVWRs (*see* App. A), as did roughly 99 percent of discovery opt-ins and 91 percent of non-discovery opt-ins. (Scott Decl. ¶ 9.) The extent to which Plaintiffs and opt-ins drove vehicles with unknown GVWR varies significantly, ranging from roughly one to 100 percent. (*Id.*)

## LEGAL STANDARD

The FLSA authorizes a collective action when the complaining employees who opted in to the lawsuit are "similarly situated." 29 U.S.C. § 216(b). To facilitate early notice of such actions, courts in the First Circuit liberally grant "conditional" certification of collective actions using a lenient standard that relies on "the pleadings and any affidavits" submitted by the plaintiffs. *Johnson v. VCG Holding Corp.*, 802 F. Supp. 2d 227, 233-34 (D. Me. 2011). But the court must re-evaluate the propriety of a collective action under a stricter standard after the close of discovery, when it has the benefit of a more developed factual record. *Norceide v. Cambridge Health All.*, No. CIVA 10-11729-NMG, 2014 WL 775453, at *3 (D. Mass. Feb. 24, 2014). At this second stage, plaintiffs must prove they are in fact "similarly situated" to the employees who opted in by a preponderance of the evidence. *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012); *see also DaRosa v. Speedway LLC*, 557 F. Supp. 3d 315, 318 (D. Mass. 2021).

To satisfy this standard, Plaintiffs must present evidence showing they are similarly situated "with respect to their allegations that the [FLSA] has been violated," such that their liability and damages claims can be tried through representative evidence and resolved on a collective-wide basis. *McKnight v. Honeywell Safety Prod. USA, Inc.*, No. CV 16-132 S, 2017 WL 3447894, at *7 (D.R.I. Aug. 11, 2017). If they cannot, the conditionally certified collective

must be decertified.[5] Employees are not similarly situated merely because they allege the same FLSA violation, such as unpaid overtime. *See Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 673 (6th Cir. 2012) (proof of "individual FLSA violations" among plaintiffs did not show they were "similarly situated plaintiffs [who] experience[ed] a common FLSA injury" (emphasis added)).[6] Rather, they are similarly situated when they "have similar (not identical) job duties and pay provisions, and are victims of a common policy or plan that violated the law." *Venegas v. Glob. Aircraft Serv., Inc.*, 159 F. Supp. 3d 93, 106 (D. Me. 2016) (emphasis added).[7]

Three factors inform this inquiry: (1) the disparate factual and employment settings of each plaintiff; (2) the extent to which the defendant has individualized defenses; and (3) fairness

---

[5] *See, e.g.*, *Zavala*, 691 F.3d at 538 (alleged common scheme was "of minimal utility in streamlining resolution" and "[l]iability and damages still need[ed] to be individually proven"); *Noll v. Flowers Foods Inc.*, 478 F. Supp. 3d 59, 66 (D. Me. 2020) (plaintiff did "not suppl[y] the kind of representative evidence . . . that would warrant a collective proceeding"); *Norceide*, 2014 WL 775453, at *4 (absent "evidence of a corporate policy" that violated the FLSA, "liability cannot be determined on a class-wide basis").

[6] *See also, e.g.*, *Avila v. SLSCO, Ltd.*, No. 3:18-cv-00426, 2022 WL 784062, at *11 (S.D. Tex. Mar. 15, 2022) (allegations of "a widespread plan or policy to deny [employees] overtime compensation" was "not sufficient to establish class-wide similarity"); *Lockhart v. D&S Residential Servs., LP*, No. 2:18-cv-02586, 2020 WL 4717910, at *9 (W.D. Tenn. Aug. 13, 2020) (rejecting assertion that employer's "failure to provide overtime compensation qualifies as a common theory of FLSA violations"); *Carruthers v. Keiser Sch., Inc.*, No. 8:09-cv-02641, 2010 WL 5055876, at *2 (M.D. Fla. Dec. 3, 2010) ("To conclude that an employee may establish the similarly situated requirement simply by claiming violations of the law by the same employer, would be to conclude that any time employees alleged unpaid overtime due from the same employer, such employees would be similarly situated." (internal quotation marks and citation omitted)); *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 119 (D.D.C. 2004) (similar).

[7] *See also, e.g.*, *Zavala*, 691 F.3d at 538 ("Being similarly situated . . . . means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA."); *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009) (employees "are similarly situated when they suffer from a single, FLSA-violating policy" or when their "claims [are] unified by common theories of defendants' statutory violations"), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016); *Avila*, 2022 WL 784062, at *10 ("Plaintiffs must demonstrate a common plan to violate the law . . . ."); *Martin v. Sprint/united Mgmt. Co.*, No. 15 Civ. 5237 (PAE), 2016 WL 30334, at *6 (S.D.N.Y. Jan. 4, 2016) ("the relevant practice that binds FLSA plaintiffs together must be the one that is alleged to have violated the statute itself").

and procedural considerations. *Norceide*, 2014 WL 775453, at *3. Plaintiffs are not similarly situated, and decertification is warranted, when there are "legally significant differences" among opt-ins that preclude collective-wide adjudication of liability and damages. *Mathis v. Darden Rests.*, No. 12-cv-61742, 2014 WL 4428171, at *2 (S.D. Fla. Sept. 1, 2014); *see DaRosa*, 557 F. Supp. 3d at 319-22 (decertifying collective because whether opt-in plaintiffs were exempt from overtime pay was an individualized, fact intensive inquiry); *Noll*, 478 F. Supp. 3d at 65-67 (decertifying collective of drivers asserting overtime claims where plaintiff "failed to demonstrate that the TCA [small vehicle] exception to the [Motor Carrier Act exemption] . . . is anything other than thoroughly individualized"); *Norceide*, 2014 WL 775453, at *4 (decertifying collective where plaintiffs did not provide "sufficient evidence of a corporate policy to require work without pay that would render class-wide resolution appropriate").

## ARGUMENT

### I. THE OPT-INS' DISPARATE FACTUAL AND EMPLOYMENT SETTINGS SHOW THEY ARE NOT SIMILARLY SITUATED

First, Plaintiffs cannot point to any single, FLSA-violating policy that unifies the discrete, individual overtime violations Plaintiffs allege. Second, there are many, material differences among Plaintiffs and opt-ins—as to pay, hours worked, vehicles driven, and more—that belie any notion that they are similarly situated with respect to proving those alleged violations.

#### A. Plaintiffs' and Opt-Ins' Overtime Claims Are Not Unified by a Common Policy or Practice that Violates the FLSA

When determining whether members of a collective are similarly situated, courts look foremost to whether evidence reveals a unifying factual nexus that binds the opt-ins' claims together <u>vis-à-vis the alleged FLSA violation</u>. *See DaRosa*, 557 F. Supp. 3d at 318 ("[t]he substantive dispute" concerning the alleged FLSA violation "informs the similarly situated analysis"). (*See* n.7, *supra*.) Absent that common factual link among the alleged violations—

usually a collective-wide policy or practice that produces the violation itself—plaintiffs are not similarly situated, regardless of any other ways in which their work experiences may be similar.

No such policy or practice exists here. Plaintiffs do not even allege that a common pay policy or mandate produced the alleged overtime violations, nor could they. Instead, Plaintiffs sought conditional certification on the basis of FedEx Ground's "policy" of contracting with Service Providers while allegedly being drivers' joint employer. *See Roy v. FedEx Ground Package Sys., Inc.*, 353 F. Supp. 2d 43, 74 (D. Mass. 2018). But that decision is not a "common policy" that can support final certification. FedEx Ground's alleged status as a joint employer says nothing about whether there was an FLSA violation. Any finding that such a relationship exists would get Plaintiffs only to the starting line of where most wage and hour cases begin (i.e., having an identified employer), leaving such critical liability determinations about the occurrence of any violation—whether Plaintiffs were eligible for, entitled to, or paid overtime—to be made based on the varying, individualized evidence pertinent to each Service Provider and opt-in.

1. FedEx Ground's alleged status as a joint employer does not provide a basis for maintaining a collective action.

Plaintiffs cannot prove their entitlement to final certification by claiming they are similarly situated with respect to FedEx Ground's status as a joint employer. Were that the case, every wage-and-hour employment case against a single employer would be certified. That is neither the law nor the standard: Sharing a common employer does not render employees similarly situated, even when they allege the same type of violation. More is needed. Courts routinely decertify collective actions even where the plaintiffs have a single, undisputed employer if the alleged violations do not have a central source, but, instead, stem from the discretionary acts of different supervisors operating in different locations. *See, e.g.*, *Campbell v. City of L.A.*, 903 F.3d 1090, 1120 (9th Cir. 2018) (affirming decertification: evidence showed no "uniform policy

against reporting small amounts of overtime" but, instead, "variable practices variably applied" by "supervisors at discrete worksites"); *Norceide*, 2014 WL 775453, at *4 (decertifying collective: resolution would "require individualized inquiries into the actions of different supervisors"); *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 854 (N.D. Ohio 2013) (decertifying collective: application of corporate policy and whether violation occurred varied with individual managers); *Scott v. Raudin McCormick, Inc.*, No. 08-4045-EFM, 2010 WL 5093650, at *4 (D. Kan. Dec. 8, 2010) (decertifying collective: evidence showed "pay practices were inconsistently applied as to any particular [p]laintiff"); *cf. Purdham v. Fairfax Cnty. Pub. Sch.*, 629 F. Supp. 2d 544, 548-50 (E.D. Va. 2009) ("[B]ecause the method by which [plaintiffs] are paid and the amount of money they are paid vary widely among individual schools, each FLSA claim will have to be evaluated on its own merits.").

This situation is no different. Joint employment is merely a status; it is not an FLSA violation. Thus, just as in single-employer cases lacking a central source of FLSA violations, Plaintiffs' joint-employer theory (and the alleged common policies on which that theory is based) does not warrant collective treatment because there is no common basis for proving the underlying wage violations. *See, e.g.*, *Zavala*, 691 F.3d at 537-38; *Avila*, 2022 WL 784062, at *10 (decertifying collective where plaintiffs "presented no evidence [putative joint employer] had any say" in subcontractors' allegedly improper "pay practices").

*Zavala* is instructive. There, the Third Circuit affirmed decertification of a collective action brought against a putative joint employer (Wal-Mart) by plaintiffs who "worked at dozens of different stores, for numerous different contractors," about 70, "with various pay amounts and methods." 691 F.3d at 531, 538. Like Plaintiffs here, the *Zavala* plaintiffs theorized that Wal-Mart had a "policy" of using the employees of independent contractors to clean its stores "on the

cheap," while still maintaining substantial control over various aspects of the workers' duties and employment conditions. *Id.* at 538. The court recognized the plaintiffs' "allegation of a common scheme to hire and underpay" workers, along with common evidence that Wal-Mart exercised employer-like control, "provides some common link among the proposed class." *Id.* But it still affirmed decertification because those "common links are of minimal utility in streamlining resolution" of the plaintiffs' FLSA claims. *Id.* Given the "numerous differences" among the opt-ins—including that they "worked varying hours and for different wages depending on the contractor"—the court concluded they were not similarly situated because "[l]iability and damages [would] still need to be individually proven." *Id.*

Since this Court granted conditional certification here, courts more often than not have denied <u>conditional</u> certification due to these inherent problems with similar claims. They hold that a defendant being an alleged joint employer is insufficient glue for a collective action in the absence of any allegation or evidence of a common, <u>FLSA-violating policy</u> for which the alleged joint employer is responsible. *See Gibbs v. MLK Express Servs., LLC*, No. 2:18-cv-434, 2019 WL 2635746, at *1-8 (M.D. Fla. June 27, 2019) (denying conditional certification where plaintiff's "evidence does not show [alleged joint employer] engaged in, or has control of, any common payment policy or plan [that] violates the FLSA"); *Emonds v. Amazon.com, Inc.*, No. 2:19-cv-01613, 2020 WL 5993908, at *3-6 (W.D. Wash. Oct. 9, 2020) ("[plaintiff] must plausibly allege a material similarity among the potential plaintiffs <u>with regard to the denial of overtime payment beyond Amazon's alleged status as their joint employer</u>" (emphasis added)); *Oglesby*, 2023 WL 4740160, at *3-5; *Nelson*, 2018 WL 6715897, at *5-8; *Aristizabal*, Hr'g Tr. 41:8-43:15 (Scott Decl., Ex. B.); *see also Martin*, 2016 WL 30334, at *6-11 (denying conditional certification against putative joint employer because pay decisions rested with plaintiff's direct employer and

plaintiff did not "make any concrete factual allegations to the effect that . . . the wage, hour, and classification practices that they protest were imposed by, or derived from, [putative joint employer] itself"). This framework ensures sufficient commonality to justify collective treatment; otherwise, critical differences among their experiences—often a result of discretionary decisions made by multiple independent actors—render collective adjudication impossible.

This case does not fit the framework for final certification and even more clearly requires decertification than in *Zavala*. FedEx Ground's decision to contract with Service Providers for pickup and delivery services does not make Plaintiffs and opt-ins similarly situated any more than would its decision to directly hire its own employees to provide those services. Neither decision "help[s] demonstrate a violation of the FLSA." *Zavala*, 691 F.3d at 538. Instead, proof of any violation rests on the individual circumstances of each driver and the varying compensation plans adopted by each Service Provider (among other proof): "even assuming Plaintiffs could establish FedEx was a joint employer, . . . in order to determine FedEx's liability for the alleged violations, a fact finder would be required to consider whether a putative class member worked for [a Service Provider] that paid overtime." *Hinds*, 2021 WL 4926980, at *10; *see also Gibbs*, 2019 WL 2635746, at *8 ("[E]ven if the Court ultimately determined Amazon is a joint employer, it would still need to examine every DSP's payment scheme individually for FLSA violations.").

"Liability and damages" would "still need to be individually proven." *Zavala*, 691 F.3d at 538; *Overpeck*, 2022 WL 888441, at *11 ("T[he factfinder will need to consider every [Service Provider] separately when determining whether its drivers were wrongfully deprived of their opportunity to take meal/rest breaks."); *Corley*, 2022 WL 1805435, at *11 ("[e]ven if the Court did find that the members of Subclass A were employees, it would still have to conduct an individualized inquiry" to resolve reimbursement claim); *Lightfoot*, Order Den. Mot. for Class

Cert. 11-15 (off-the-clock claims not amenable to class treatment where Service Providers "each had different timekeeping and wage policies") (Scott Decl., Ex. C). Indeed, there is no dispute that the conditional collective includes opt-ins that (1) did not work overtime, (2) were not entitled to overtime premium pay when they worked overtime because they were in heavy vehicles, or (3) were in fact paid overtime when they were entitled to it (and, in some instances, when they were not). Thus, any joint employment finding would not materially advance this case, as proving Plaintiffs' and opt-ins' overtime claims require a showing that FLSA violations <u>actually</u> occurred, not just a showing of who could be held liable for violations that <u>might have</u> occurred. *See Hinds*, 2021 WL 4926980, at *8 ("If the joint employer issue is resolved in Plaintiffs' favor, FedEx's arguments regarding what Plaintiffs would need to establish to show it is liable convince the Court that certification of that limited issue 'would not materially advance the disposition of this litigation as a whole.'").

2. FedEx Ground's decision to contract with Service Providers had no common impact on Plaintiffs' or opt-ins' pay or the occurrence of any alleged overtime violations.

FedEx Ground's decision to contract with Service Providers has no common impact on Plaintiffs' and opt-ins' pay or the occurrence of any alleged overtime violations, and the Agreements expressly state Service Providers must comply with all wage and hour laws. The evidence, instead, shows this so-called "policy" of contracting with Service Providers impacted opt-ins in <u>different</u> ways (if at all) because they were subject to <u>different</u> pay policies set by different decisionmakers. (App A; Facts, § II.A.) Employees are not similarly situated if their individual claims turn on disparate responses to an allegedly uniform policy—or, as here, on the discretionary compensation practices adopted by over 160 actors. *Zavala v. Wal-Mart Stores, Inc.*, No. 2:03-cv-05309, 2010 WL 2652510, at *3 (D.N.J. June 25, 2010) (employees "worked varying hours and for different wages" and "[t]he compensation structure for each individual

also varied depending on the contractor"; "[t]hese facts . . . strongly undermine Plaintiffs' contention that they are similarly situated"), *aff'd*, 691 F.3d 527; *Avila*, 2022 WL 784062, at *10.[8]

Here, Plaintiffs cannot show they were paid under any common pay policy or directive that resulted in universal denial of overtime pay for all (or even most) opt-ins. Service Providers, by contract and in fact, decide for themselves how to pay their employees, with the only limitation being that they comply with the law when they do so. (Facts, §§ I.B, II.A.) There is no evidence that FedEx Ground directed any Service Provider—let alone <u>all</u> Service Providers—on how to pay drivers. (*Id.*) Nor is there evidence that Service Providers adopted similar pay practices or uniformly chose not to pay overtime to drivers operating light vehicles. To the contrary, Plaintiffs and the discovery opt-ins received virtually every form of pay: hourly, piece-rate (per stop or per package), weekly or daily salaries, discretionary and non-discretionary bonuses, and combinations of all of the above. (App. A.) Opt-ins also received overtime pay. (*Id.*)

The record therefore precludes resolution of the opt-ins' overtime claims through <u>representative</u> evidence, as <u>there is no representative evidence</u> of how they were paid. This requires decertification. *See Zavala*, 2010 WL 2652510, at *3; *Avila*, 2022 WL 784062, at *10.[9]

---

[8] *See also Oglesby*, 2023 WL 4740160, at *3-4 (finding "no strong likelihood" that drivers employed by Service Providers are similarly situated when there was "no evidence . . . that any FedEx policy, plan or decision affected the drivers' alleged failure to receive overtime payments"); *Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625, 2011 WL 2009967, at *5-6 (W.D. Wis. May 23, 2011) (decertifying collective "despite . . . finding[] at the certification stage that plaintiffs' claims were grounded . . . in defendants' uniform policies and practices" when evidence "suggests that proof of plaintiffs' claims depends on how individual technicians responded to the numerous policies and practices at issue"), *aff'd*, 705 F.3d 770 (7th Cir. 2013); *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 374 (E.D. Mo. 2014) (decertifying collective: allegedly unlawful policy "affected the [p]laintiffs in different and individual ways").

[9] *See also, e.g.*, *Scott*, 2010 WL 5093650, at *4 (decertifying collective: "evidence proffered by Defendants suggests that pay practices were inconsistently applied as to any particular Plaintiff, thereby requiring testimony not suited to representative testimony in this case"); *cf. Smith v. Smithfield Foods, Inc.*, No. 2:21-cv-194, 2021 WL 6881062, at *13-14 (E.D. Va. Dec. 21, 2021) (denying certification: plaintiffs worked at 45 plants operated by three different companies and

### B. Material Differences in Opt-ins' Factual and Employment Settings Preclude Collective Resolution of Their Overtime Claims and Require Decertification

Opt-ins admit they addressed their pay, schedules, which vehicles they drove, and directions about their work with their Service Providers, not FedEx Ground. (App. E.) Their experiences therefore differ significantly from each other as to all of these issues. (Apps. A-D; *see also* Facts, §§ II.A−II.C.) Their experiences also differ in terms of the quality and extent of their interactions with FedEx Ground throughout their employment with Service Providers, as well as their allegations of how FedEx Ground supposedly supervised them or controlled their working conditions (if at all). (App. A; *see also* Facts, §§ II.D−II.E.)

Plaintiffs therefore cannot be "similarly situated" and decertification is required. *See Zavala*, 691 F.3d at 538; *Avila*, 2022 WL 784062, at *9-10; *Mathis*, 2014 WL 4428171, at *4 (plaintiffs "worked across numerous locations" and "experienced varying policies and practices").

## II. FEDEX GROUND'S INDIVIDUALIZED DEFENSES AGAINST DRIVERS' CLAIMS REQUIRE DECERTIFICATION

To prove FedEx Ground is liable on their overtime claims, each opt-in must prove that:

- FedEx Ground was their joint employer;
- they were eligible for overtime pay under the Small Vehicle Exception to the FLSA's Motor Carrier Act ("MCA") Exemption;
- they were entitled to overtime pay (i.e., they worked over 40 hours during a workweek in which they drove a light vehicle); and
- their Service Providers did not pay them overtime premium pay when eligible.[10]

Most cannot prove these facts on an individualized basis, let alone a collective one. The material

did not offer evidence of a "single [pay] policy or plan across all facilities and companies" and other evidence showed pay policies were "diverse and complicated" (emphasis by court)).

[10] The court in *Claiborne* has already rejected Plaintiffs' counsel's attempts to lump everything other than joint employment into the category of "damages"; all of these are liability questions. *See Claiborne* Mem. Op., at 18 n.8 (Scott Decl., Ex. A).

differences in their employment settings make them dissimilar as to each of these key issues, thus requiring individualized evidence and fact-finding and the opportunity for FedEx Ground to individually defend against them. This, too, calls for decertification. *See, e.g.*, *Zavala*, 691 F.3d at 538; *Rindfleish v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014) ("[A] collective action is improper when actual liability cannot be established on a class-wide basis.").

### A. Plaintiffs Cannot Prove Joint Employment with Common Evidence, thus Raising Individualized Claims and Defenses

Despite their superficial allegations of "similarity," Plaintiffs and opt-ins had different experiences that bear on the joint employment inquiry. Proceeding collectively would prejudice FedEx Ground by precluding it from defending against joint employment claims based on each opt-in's actual, and unique, experiences.

Four factors inform the joint-employment determination: "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 & n.9 (1st Cir. 1998). But the inquiry does not turn on generalized considerations or mechanistic application of these factors: "it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." *Id.* at 676; *see also Sanchez v. Simply Right, Inc.*, No. 15-cv-00974, 2017 WL 2222601, at *6 (D. Colo. May 22, 2017) (joint employment analysis required evaluation of facts "relevant to a particular plaintiff," not the aggregate circumstances involving all plaintiffs). Thus, the same company can be a joint employer as to one employee but not others. *Compare Henderson v. Equilon Enters., LLC*, 40 Cal. App. 5th 1111, 1130 (2019) (not joint employer), *with Medina v. Equilon Enters., LLC*, 68 Cal. App. 5th 868, 871 (2021) (joint employer); *cf. Carrier Corp. v.*

*N.L.R.B.*, 768 F.2d 778, 781 n.1 (6th Cir. 1985) ("[A] slight difference between two cases might tilt a case toward a finding of a joint employment.").

Because joint employment is a wholistic, fact-specific inquiry, courts routinely hold it is "unsuitable for collective treatment" when, as here, claimants worked for different contractors, in disparate locations, and under varying employment conditions. *Arnold v. Directv, LLC*, No. 4:10-cv-352, 2017 WL 1251033, at *3 (E.D. Mo. Mar. 31, 2017) ("varying employment circumstances of the collective . . . create individual defenses" as to the "inherently fact intensive" joint employer analysis); *accord Avila*, 2022 WL 784062, at *15 ("a proper joint-employer analysis for the putative classes" would require applying the economic realities test to collective "members [who] worked for 21 (or more) different subcontractors"); *Zavala*, 2010 WL 2652510, at *4-5 (joint employment inquiry "depends on the individual facts and circumstances relating the various contractors and the activities at each separate store location"); *cf. Gibbs*, 2019 WL 2635746, at *9 ("joint employer issues will destroy judicial economy" of a collective implicating "an unknown number of [contractors] separately employing a vast number of [drivers] and contracting with Amazon").

The same is true here. It would be unfairly prejudicial to decide joint employment based on one Plaintiff's claim that he interacted frequently with FedEx Ground on work issues when many opt-ins had little to no interaction. (App. A (*compare, e.g.*, Roy, *with* Dean, Dillon, Sattler).) Or where one opt-in claims FedEx Ground fired him while Roy and Trumbull admitted their Service Provider fired them with no involvement or "help" from FedEx Ground. (*Compare* Julio Dep. 128:11-13, 157:4-158:19 (claiming that disqualification for package theft effectively ended his employment as a driver but admitting Service Provider's owner still kept him employed as a mechanic), *with* Roy Dep. 13:10-12, 101:19-22, *and* Trumbull Dep. 60:6-14. One deposed

opt-in even had different experiences with FedEx Ground based on different managers at different locations. (App. A (McDonald); Facts, § II.E.) These examples cover just a few ways opt-ins' work experiences materially differed. Many others exist. (*See* App. A.)

The Agreement each Service Provider signed states that FedEx Ground does not have the power to hire or fire drivers, determine their schedules or other conditions of employment, supervise or discipline them, determine the rate and method of pay, or maintain their employment records. (Rosales Decl. ¶ 13 & Ex. A (Agreement § 1.2).) That is the only "common policy" that exists in this case. As a result, to prove joint employment, Plaintiffs must each prove that FedEx Ground acted inconsistently with this common policy, precluding any trial on purported "representative" evidence. *See, e.g.*, *Creal v. Grp. O, Inc.*, 155 F. Supp. 3d 831, 841 (N.D. Ill. 2016) ("[I]nconsistent enforcement [of written policy] falls far short of the identifiable factual nexus that . . . is needed to retain collective certification." (internal quotation marks omitted)); *Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1051-52 (2012) (affirming denial of certification of off-the-clock claim where the only formal policy "disavows such work," thus requiring an employee-by-employee analysis of liability).

### B. Eligibility for Overtime under the Small Vehicle Exception to the MCA Exemption Is an Individualized, Driver-by-Driver Determination

Whether an opt-in was even eligible for overtime also presents an individualized issue. Here, overtime eligibility depends on whether an opt-in qualifies for the Small Vehicle Exception to the FLSA's MCA Exemption.[11] (*E.g.*, Order on Mot. to Dismiss, ECF 337 (dismissing, at Plaintiffs' request, opt-in plaintiffs whose light-vehicle use was *de minimis* because they "were not eligible to receive overtime" pay).) That determination is a predicate to any finding of

[11] Plaintiffs' counsel recently emailed FedEx Ground's counsel a list of an additional 32 opt-ins they say "Plaintiffs will not be arguing belong in the collective." (Scott Decl. ¶ 12 & Ex. D.) Presumably this is due to vehicle weight ineligibility, but Plaintiffs' counsel did not specify. (*Id.*)

liability. *Noll*, 478 F. Supp. 3d at 63, 67; *accord Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 580 (5th Cir. 2018) (plaintiffs bear burden of proving eligibility under the exception).

Application of the Small Vehicle Exception is a nuanced and fact-specific inquiry that depends on how often and when a driver used a vehicle weighing 10,000 pounds or less (a "light" vehicle). But the Small Vehicle Exception has a limited scope: drivers who qualify for it are eligible for overtime only in the weeks they drove light vehicles. *Gomez v. Loomis Armored US, LLC*, No. 5:16-CV-931, 2017 WL 7052254, at *7 (W.D. Tex. Oct. 26, 2017) ("[T]he small vehicle exception . . . does not apply in those workweeks where Plaintiffs worked only with [heavy] vehicles . . . ."). Thus, determining whether a driver was improperly denied overtime pay requires a week-by-week assessment of whether they (1) worked more than 40 hours and (2) drove a light vehicle during that week. "That is a highly individualized inquiry—plain and simple." *Rosales v. Indus. Sales & Servs. LLC*, No. 6:20-CV-00030, 2021 WL 4480747, at *15 (S.D. Tex. Sept. 30, 2021).

For this reason, numerous courts have found that plaintiffs' reliance on the Small Vehicle Exception for overtime eligibility precludes collective litigation when their light-vehicle use varies widely. *See Noll*, 478 F. Supp. 3d at 66-67 ("the [small vehicle] exception to the MCA defense . . . [is] thoroughly individualized" and not subject to representative proof); *Rojas v. Garda CL Se., Inc.*, No. 1:13-cv-23173, 2015 WL 5084135, at *6 (S.D. Fla. Aug. 28, 2015) ("whether an employee is covered by the FLSA [under the Small Vehicle Exception] or the MCA requires an individual factual inquiry regarding the actual work performed by each individual employee").[12] The same is true here, requiring decertification. (*See, e.g.*, App. A; *see*

[12] *See also Rosales*, 2021 WL 4480747, at *15 ("[D]etermining whether the small-vehicle exception applies to each employee in a proposed collective requires just that—a highly individualized inquiry."); *Trevino v RDL Energy Servs., L.P.*, No. CV H-14-1936, 2016 WL

*also* Def.'s Opp. to Pls.' Mot. to Dismiss 5 Opt-Ins 11-14, ECF 312 (providing examples of unique small-vehicle-usage circumstances across opt-ins).)

Further complicating this case are the gaps in available information. Available GVWR data shows that roughly 50 percent of the collective (over 230 opt-ins) will need to have a *de minimis* analysis conducted with respect to unknown vehicle weights. (Scott Decl. ¶ 10.) There are also numerous opt-ins (roughly 48 percent) who logged 40-plus on-duty hours only in weeks they drove heavy vehicles or those with unknown weight, meaning they are ineligible for overtime pay absent an individualized fact-finding concerning unknown vehicle weights.[13] (*Id.* ¶ 11.) Individual mini-trials pertaining to just these two liability issues (among many others) will be necessary for each of these opt-ins.

### C. FedEx Ground Is Permitted to Challenge Plaintiffs' Ability to Prove that Opt-Ins Were Entitled to, But Not Paid, Overtime

It is Plaintiffs' burden to prove they performed work for which they were improperly paid (i.e., liability) and, at a minimum, the amount and extent of that work by just and reasonable inference (i.e., damages). *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).[14] For opt-ins who were eligible for overtime, further individualized evidence and fact-finding will be needed to meet this burden, as there is no representative evidence showing how all opt-ins were paid, whether they worked overtime in a week they drove light vehicles and, if they did,

---

11477431, at *29-30 (S.D. Tex. July 21, 2016) (denying conditional certification because overtime eligibility under the Small Vehicle Exception would "require[e] highly individualized analysis"); *cf. Cooper v. Noble Casing, Inc.*, No. 15-cv-1907, 2016 WL 6525740, at *4-5 (D. Colo. Nov. 3, 2016) (agreeing Small Vehicle Exception requires "individualized discovery" because application of Exception "must be established on an employee-by-employee, week-by-week basis").

[13] This calculation excludes opt-ins who logged only 40-plus on-duty hours during weeks they drove solely heavy vehicles. (Scott Decl. ¶ 11.)

[14] FedEx Ground disputes that any *Mt. Clemens* presumption would apply here because Plaintiffs would first have to prove FedEx Ground is an employer for it to apply, and they have not. However, even applying *Mt. Clemens* still puts the initial burden of proof on plaintiffs.

whether they were paid overtime. (*See* Argument, § III.) Because Plaintiffs and opt-ins were paid under a wide variety of compensation plans and worked varying hours from week-to-week and driver-to-driver, evidence as to one says nothing about any other member of the collective.

"[T]hese issues go to the fact of liability and not merely the amount of damages [an opt-in] might be entitled to recover." *Hinds*, 2021 WL 4926980, at *10; *Claiborne* Mem. Op. at 18, n.8 (Scott Decl., Ex. A). There is no FLSA violation—and no liability—if an individual opt-in (1) did not work 40-plus hours, (2) in a week they drove a light vehicle, or (3) was, in fact, paid overtime by their Service Provider for any such hours—as discovery opt-ins admitted. (*See* App. A (Sattler, Reid, Doyle, Eddington, Harrell).) Thus, Plaintiffs must prove that <u>each</u> opt-in worked overtime, in a light vehicle, and was not properly paid for it. FedEx Ground is likewise entitled to challenge any attempt to make that showing as to each and every opt-in. The need to present individualized evidence and resolve individualized fact disputes on these issues, likely through the testimony of opt-ins and their Service Providers, underscores the need for decertification.

1. Plaintiffs and opt-ins were paid under pay methods set by 162 different Service Providers, precluding representative proof of overtime violations.

Plaintiffs and opt-ins were not paid under any common policy on the method and rate of pay or the payment of overtime; nor were they paid similarly. (App. A; Argument, § I.A.2.) Quite the opposite: Plaintiffs' and opt-ins' individual pay reflects a wide-variety of methods and rates over an eight-year span—many of which <u>did</u> include premium overtime pay or were not required to because of heavy-vehicle usage. (*See* Apps. A & C.) Not only does the evidence show these many differences, but Plaintiffs and deposed opt-ins admit they do not have personal knowledge of how other drivers were paid—and whether they received overtime pay—regardless of whether they worked for the same Service Providers or different ones. (*E.g.*, Dillon Dep. 150:5-8; Davis Dep. 100:16-101:2; Lessard Dep. 60:6-8; Pilotte Dep. 116:11-22; Therrien Dep. 255:1-22.)

These facts alone require decertification, but there is more. Even the limited available evidence shows that individualized fact disputes are prevalent. For example, opt-in Marzilli claims Nelson Delivery did not pay him overtime, but he admits he doesn't actually know if he received overtime or not, and other evidence shows Nelson Delivery did pay overtime. (Marzilli Dep. 250:3-251:3; Payroll Register (Nelson Delivery), at FXG_ROY_073582.) And Marzilli is not alone. (*Compare, e.g.*, Daoust Opt-In Form, ECF 90-1 (attesting not paid overtime), *with* Daoust Paystub (Eagle Eye) (showing overtime pay), *and* Flood Opt-In Form, ECF 85-1 (attesting not paid overtime), *with* Flood Payroll Register (JEP Distribution) (showing overtime pay).)

2. Opt-ins worked varying hours that were recorded, if at all, pursuant to Service Providers' different policies.

Determining whether opt-ins worked more than 40 hours per week also requires an individualized, driver-by-driver inquiry, and goes directly to the question of liability—if an opt-in did not work more than 40 hours in a week they drove a light vehicle, there is no liability. *See Hinds*, 2021 WL 4926980, at *10 ("FedEx scanner data would not establish on a class-wide basis whether a putative class member worked overtime," which "go[es] to the fact of liability and not merely the amount of damages.").

There is no common evidence that identifies which opt-ins worked more than 40 hours in a given workweek, or when, because there is no single, undisputed source of opt-ins' compensable time. FedEx Ground does not maintain such records, and the DOT scanner records it produced are not a viable proxy, let alone a universal one.[15] (App. D; Facts, § III.A.) Trumbull and most

---

[15] Even if it were, because scanner data for each individual opt-in would have to be analyzed in detail, in addition to matching up that data with the separately-maintained vehicle weight information, for liability purposes, the case cannot proceed on a representative basis as required for final certification. *Cf. Bayles v. Am. Med. Resp. of Colo., Inc.*, 950 F. Supp. 1053, 1065 (D. Colo. 1996) ("It is oxymoronic to use [a collective action] in a case where proof regarding each individual plaintiff is required to show liability.").

deposed opt-ins insist those records undercount the hours they worked, yet with no consistency as to when, why, or by how much. (Facts, § III.A.) Roy claims his scanner data sometimes underreports his time, but he admits it also overreports it (Roy Dep. 211:17-212:9 (claiming he arrived both before and after 7:00 a.m., though his on-duty time says exactly 7:00 a.m.); *id.* at 167:9-168:11 (occasional unrecorded breaks)), as do several other opt-ins (Reid Dep. 131:24-132:14 (unrecorded breaks); Vander Brug Dep. 106:2-21 (same); Sattler Dep. 138:1-23 (same)). Appendix D details Plaintiffs' and opt-ins' divergent hours, as reflected in the various available sources.

Moreover, Service Providers establish their own workweeks,[16] such that the beginning and end of a workweek varies across Service Providers. (App. A (*compare* JEP Distribution (Saturday to Friday workweek), *with* Lexis Corp. (Sunday to Saturday workweek).) Thus, even if scanner data could be used as a substitute for compensable time, the jury would still need to make individualized fact findings concerning the applicable workweek to determine if an opt-in worked overtime (and if they used a light vehicle in that workweek), because the "workweek" is the "basis for applying" the FLSA's overtime requirements. *See* 29 C.F.R. § 778.103.

While Service Providers' time records would be the best source for identifying compensable time, that is far from common evidence. And many opt-ins claim there is no accurate record of their compensable time and that the only evidence they can proffer is their own testimony. (*See* Robertson Dep. 162:16-19 (rejecting scanner data; "Q. So how could we possibly figure out what hours you worked? A. Well, you [sic] just going to have to take my word for it."); Flowers Dep. I at 58:2-9 ("Q. So how could we figure out what hours you were working when sometimes you were showing up at 4:30 and sometimes you were [showing up] at 6:30 but

[16] 29 C.F.R. § 778.105 ("employee's workweek . . . . need not coincide with the calendar week").

[the] scanner data doesn't show that? . . .A. I have no idea. I mean it's my word against theirs, obviously, but that's what happened."); Lessard Dep. 225:4-11 (no record of hours worked before logging on to scanner, so his estimate of those unrecorded hours is "based on [his] memory").)

As a matter of law, FedEx Ground is entitled to challenge and rebut assertions about the hours Plaintiffs and opt-ins claim they worked. *See, e.g.*, *Mt. Clemens*, 328 U.S. at 687-89 (recognizing defendant's right to introduce "evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence" on the extent of improperly compensated work). These various, contradictory sources of evidence create fact disputes that must be resolved at trial—for every opt-in. Discovery revealed opt-ins' claims of under- and over-reported hours only because some discovery opt-ins were deposed, giving both parties the opportunity to probe behind or explain each deposed opt-in's logged on-duty time. Yet similar discrepancies exist for non-deposed discovery opt-ins, many of whom reported "average" hours that differ significantly from what appears in the scanner data. (*See* App. D (e.g., non-deposed opt-ins Allen, Cosme, Germain, Lima).) There is no way to know who among the remaining 389 non-discovery opt-ins present the same issues without individual inquiry.

**D. FedEx Ground Is Entitled to Challenge Individual Damages Claims**

Decertification is also warranted because there is no formulaic, one-size-fits-all method for proving or computing Plaintiffs' and opt-ins' damages (if any). *See Espenscheid*, 705 F.3d at 774; *Merrill v. Pathway Leasing LLC*, No. 16-CV-02242, 2019 WL 5078655, at *4 (D. Colo. Oct. 9, 2019). The wide variance in their pay and hours, coupled with the absence of documented evidence concerning either, will require individualized fact-finding to determine each opt-in's damages. Failing to do so would improperly "confer a windfall" on some and undercompensate others. *See Espenscheid*, 705 F.3d at 774; *accord Hinds*, 2021 WL 4926980, at *10.

In addition to the need for individualized inquiry as to hours worked as just discussed, the

applicable overtime rate cannot be determined without individualized fact-finding for both Plaintiffs and each opt-in and as to each week in which they have first proven they qualified for overtime pay. The FLSA requires payment of overtime at one and one-half times an employee's "regular rate," which must be computed as an hourly rate even when the employee is paid on some other basis (e.g., salary, piece-rate). 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.109. The regular rate is determined by dividing the employee's total pay for the workweek, including non-discretionary bonuses, by the total number of hours the employee "actually worked" in that week. 29 C.F.R. § 778.109; *see also* 29 C.F.R. §§ 110-113.

Because Plaintiffs and opt-ins were not paid uniformly (or even similarly), the manner and amount of their weekly pay must be determined individually—and, for most, both or either varied over time. Roy and Trumbull were paid a per-stop rate, so the amount of their weekly pay varied based on the total stops they had each week. (App. A.) Some opt-ins received bonuses that may have to be factored into their regular rate. (*Id.* (e.g., Monahan, Pilotte, Robertson, Costello).) And some opt-ins reported being paid different rates, under different methods, and at different times—sometimes by the same Service Provider. (*Id.* (e.g., Reid, Sattler, Lima, Santos).)

These individualized damages issues provide yet another reason why the collective must be decertified. *See Espenscheid*, 705 F.3d at 773-75 (affirming decertification where proving the hours each plaintiff worked to determine the regular rate required individual evidence); *Merrill*, 2019 WL 5078655, at *2-3 (the "numerous individualized factual considerations that must be analyzed in reaching the damages determination . . . supports decertification").

### E. Inconsistent Testimony and Questions about Plaintiffs' and Opt-Ins' Credibility Underscore the Individuality of FedEx Ground's Defenses

Questions about a claimant's credibility "necessitate individual inquiries into the merits of each opt-in's claims and make the use of representative proof problematic . . . ." *Levine v. Vitamin*

*Cottage Nat. Food Mkts., Inc.*, No. 20-cv-00261, 2023 WL 3648684, at *11 (D. Colo. May 25, 2023) (internal quotation marks omitted). Plaintiffs who disavow previous written statements, contradict their sworn declarations, or contradict their interrogatory answers cannot credibly testify as to their own work experiences, much less other people's. *See Aquilino v. Home Depot, U.S.A., Inc.*, No. CIVA. 04-04100 PGS, 2011 WL 564039, at *9 (D.N.J. Feb. 15, 2011). Such contradictions make it "difficult and confusing" for the fact-finder to assess individual claims, *id.*, demonstrate "the importance of cross-examination of each plaintiff[,] and suggest the need for separate mini-trials to resolve each individual's claim." *Levine,* 2023 WL 3648684, at *11.[17]

Though FedEx Ground was permitted to depose only Plaintiffs and a small fraction of opt-ins, virtually all of those depositions revealed inconsistencies and credibility issues that bear on liability. The following are a few examples from the many detailed in Appendix F:

- Trumbull initially attested that he "frequently received calls from a FedEx Manager" regarding deliveries, but later admitted this statement was "inaccurate" and that he "didn't really talk to managers during the day." (App. F. at 9.) He also claimed FedEx Ground "interviewed" him, though later admitted that the FedEx Ground employee just gave him access to a computer, and when Trumbull was asked whether that employee asked him questions, he replied, "I don't know." (*Id.* at 12.)

- Marzilli stated he did not receive overtime pay from either of his Service Providers, but admitted he never reviewed his paystubs and actually <u>does not know</u> if he received overtime pay or not from either one. (App. F at 19.)

- Moore admitted in his questionnaire response that he drove a <u>heavy</u> vehicle roughly 90 percent of the time he worked for Parcel & Pallet and all of the time he worked for Mid-Cape Delivery Services. But during his deposition, Moore recanted those statements and said he drove "<u>smaller</u>" trucks (App. F at 27), though he claimed both that he drove smaller trucks the "majority of the time" (Moore Dep. 68:5-7) and that he could not recall how often he drove a smaller truck (*id.* at 222:18-223:3).

[17] *See also Espenscheid*, 2011 WL 2009967, at *7 (defenses that "go[] to the credibility of certain plaintiffs' testimony and claims . . . would be difficult to assert without the ability to cross-examine individual" plaintiffs); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 586 (E.D. La. 2008) (defendant's "inability to cross-examine the vast majority of the opt-in plaintiffs was prejudicial" given "multiple examples of inconsistencies between plaintiffs' depositions and their survey responses" and other "internal inconsistencies" in opt-in plaintiffs' evidence).

- Pilotte claims that during peak season he worked one to two hours before logging in as "on-duty." (Pilotte Dep. 78:25-79:7, 83:10-23, 84:19-85:1.) His scanner data, though, does in fact show these significant time gaps (between his on-duty time and dispatch times). (*Id.* at 193:12-194:4.) When confronted with this evidence, Pilotte claimed there were several weeks of "missing data," though he did not explain how that data would corroborate his story. (*Id.* at 194:5-195:2.)

(*See also* App. D (identifying inconsistencies in hours Plaintiffs' and opt-ins' allegedly worked).)

## III. FAIRNESS AND MANAGEABILITY CONSIDERATIONS WARRANT DECERTIFICATION OF THE CONDITIONALLY-CERTIFIED COLLECTIVE

Plaintiffs cannot prove that fairness and procedural considerations favor proceeding collectively because of the vast dissimilarities among the opt-ins. The "purpose of a collective action [is] to streamline adjudication of [] claims" asserted by members of the collective. *Norceide*, 2014 WL 775453, at *4. "The idea of representative proof is that plaintiffs could provide testimony from a sample of [workers]" whose experiences "can then be extrapolated to the remainder of the group without significant error." *Espenscheid*, 2011 WL 2009967, at *5. While that may be possible when workers have "relatively uniform experiences," it is not when the evidence "reveals substantial variations among the opt-in[s]." *Id.* at *6-7. "[S]ignificant differences in employment experiences" cause any "procedural advantages . . . [to] evaporate," making it unlikely that "a just verdict on the merits can be rendered" with so-called representative evidence. *See Johnson*, 561 F. Supp. 2d at 588.

A jury cannot draw "just and reasonable inference[s]" about absent opt-ins on the basis of disparate and nonrepresentative evidence. *See Sec'y of Lab. v. DeSisto*, 929 F.2d 789, 794 (1st Cir. 1991). "To extrapolate from the experience" of Plaintiffs and a few opt-ins to all 450-plus that remain would require consistency among their experiences—that all did "roughly . . . the same amount of overtime work[] and [were] paid the same wage," *Espenscheid*, 705 F.3d at 774; or that there was "consistency among [their] testimony" and a "consistently applied policy" that resulted in unpaid overtime work, *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278,

284 (N.D. Tex. 2008). None of that exists here. Instead, the record as summarized in Appendices A-F reveals wide material discrepancies among Plaintiffs' and discovery opt-ins' experiences.

Precluding the presentation of this individualized evidence would prejudice both FedEx Ground and absent opt-ins. Neither Plaintiffs' testimony nor that of a few opt-ins will "accurately capture each [opt-in's] diverse factual circumstances." *Reed v. Cnty of Orange*, 266 F.R.D. 446, 462 (C.D. Cal. 2010); *see also Levine*, 2023 WL 3648684, at *11. Proceeding on the basis of this plainly unrepresentative testimony would deprive FedEx Ground of the ability to challenge, explore, test, and assert defenses to each opt-in's individualized claims. It would also raise the prospect of a windfall to some opt-ins and a shortfall to others. Thus, collective adjudication would be fundamentally unfair.[18] *See Mathis*, 2014 WL 4428171, at *5 ("collective adjudication would not be fair or manageable" where it could "not account for material distinctions between [d]efendant's liability to different [] [p]laintiffs" and plaintiffs "would not receive recoveries based on their individual experiences").

The "mini-trials" that would be required would be overwhelming and confusing, "requiring a jury to sort out all of that evidence—Plaintiff by Plaintiff—to make [the] specific, fact-intensive findings" needed to reach a verdict on each opt-in's claims. *See Arnold*, 2017 WL 1251033, at *9, 12. That is the "antithesis of a collective action." *Reed*, 266 F.R.D. at 463; *cf. Overpeck*, 2022 WL 888441, at *12 (need for separate evidence from each Service Provider "precludes a finding of superiority and manageability").

## CONCLUSION

For all of these reasons, the Court must decertify the conditional collective.

---

[18] In contrast, litigation by individuals and small groups against specific Service Providers is far more manageable, and pending and previous litigation shows there is interest in pursuing such cases. *See, e.g.*, *McElwee v. Bryan Cowdery, Inc.*, No. 2:21-cv-1265, 2021 WL 5027410 (S.D. Ohio Oct. 29, 2021); *Henry v. Cunex, Inc.*, No. 1:23-cv-03347-PKC-CLP (E.D.N.Y. 2023).

Dated: August 18, 2023

Respectfully submitted,

*/s/ Jessica G. Scott*

Jessica G. Scott
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone: 303.244.1800
Facsimile: 303.244.1879
Email: scott@wtotrial.com

Attorney for Defendant,
FedEx Ground Package System, Inc.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 18, 2023.

The following are those who are currently on the list to receive e-mail notices for this case.

- **Shannon Liss-Riordan**
  sliss@llrlaw.com

- **Zachary Rubin**
  zrubin@llrlaw.com

- **Krysten L. Connon**
  kconnon@llrlaw.com

- **Brian Gonzales**
  bgonzales@coloradowagelaw.com

- **Peter Winebrake**
  pwinebrake@winebrakelaw.com

- **Mark J. Gottesfeld**
  mgottesfeld@winebrakelaw.com

- **Michelle Tolodziecki**
  mtolodziecki@winebrakelaw.com

- **Richard E. Hayber** (pro hac vice forthcoming)
  rhayber@hayberlawfirm.com

- **Joseph P. McHugh**
  joseph.mchugh@fedex.com

- **Kenneth D. Sansom**
  ksansom@spotswoodllc.com

- **Cheryl B. Pinarchick**
  cpinarchick@fisherphillips.com

- **Jessica G. Scott**
  scott@wtotrial.com

- **Andrew H. Myers**
  myers@wtotrial.com

- **Michele O. Choe**
  choe@wtotrial.com
- **David J. Schaller**
  schaller@wtotrial.com
- **Juan Ramirez**
  ramirez@wtotrial.com
- **Kori F. Miller**
  kmiller@wtotrial.com
- **Celyn Whitt**
  whitt@wtotrial.com
- **Iva Velickovic**
  velickovic@wtotrial.com

*/s/ Jessica G. Scott*